### THE ERIN.

### THE NORTH AMERICA.

**(Circuit Court of Appeals, Second Circuit.    January 30, 1912.)**

#### No. 155.

COLLISION (§ 95*)—TUGS WITH TOWS MEETING—NEGLIGENCE.

 A tug, with a tow, which had just passed around the Battery and started up East River, *held* solely in fault for a collision between her tow and that of a meeting tug, a little on her starboard, in that, after she had properly given a signal to pass starboard and starboard, which was agreed to, she did not change to port as much as she should, in view of the fact that the other tug could turn out of her course very little, because of another vessel to the east of her.

 [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200-202; Dec. Dig. § 95.*

 Collision with or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by the New York, Susquehanna & Western Coal Company against the steam tug Erin (the Shamrock Towing Company, claimant) and the steam tug North America. Decree for libelant against the Erin alone, and her claimant appeals. Affirmed.

This cause comes here upon appeal from a decree holding the Erin solely in fault for a collision between libelant's barge Susquehanna, in tow of the North America, and the barge Ethel, in tow of the Erin. The collision occurred about 11 a. m. in the East River. Briefly stated, the sequence of events is as follows: The Erin rounded the Battery into the East River, and when straightened up was somewhat to the westward of mid-river, bound generally upstream. There was a steamer going upriver to the Brooklyn side of the Erin. Another vessel passed the Erin on the same side, and when far enough ahead swung over to the westward across the Erin's bow, in order to dock at Pier 32, Manhattan. While this steamer, called the docking steamer, was crossing the Erin's bow, she obscured her lookout's forward view, and also cut off the Erin from the view of any lookout above the steamer. When the steamer had swung sufficiently to the westward to remove this obstruction, the lookouts of the Erin and of the North America sighted each the other's vessel. Future movements all took place between the course of the so-called Brooklyn steamer, to the eastward, and the course of the docking steamer, to the westward.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The North America. bound down about mid-river, had seen the Brooklyn steamer before the Erin came in sight, and exchanged with her a one-whistle signal. Upon sighting the North America, the Erin blew her a two-blast signal, which was responded to with a like signal. The tugs passed each other starboard to starboard not far apart—50 to 75 feet, at the most. The tow of the North America, 250 feet astern of her, consisted of three barges, lashed side by side, with a total width of 100 feet. The starboard quarter of the single barge in tow of the Erin struck the starboard bow of the starboard barge in the North America's tow.

Jas. J. Macklin (De Lagnel Berier, of counsel), for appellant.

Wallace, Butler & Brown (J. K. Symmers, of counsel), for the North America.

Herbert Green, for appellee New York, Susquehanna & Western Coal Co.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts as above). We find no fault in the two-whistle signal of the Erin, which initiated a starboard to starboard passing. They were on substantially parallel courses and meeting head to head, or nearly so; but the Erin was to the westward of the North America, and it might well seem wiser to undertake to pass her on that side, rather than to cross over her course and get to eastward of her, with the Brooklyn steamer so near, in an effort to pass port to port.

The presence of both the interfering steamers was known when the tugs sighted each other and exchanged their signals, and it was known that their navigation would be affected accordingly. Thus the Erin knew that, unless the Brooklyn steamer got beyond the North America before the tugs came to the passing point, the North America could not shift herself substantially to the eastward, and therefore it behooved the Erin to shift herself as much to the westward as possible. On her own testimony we are satisfied that she did not do so. Her master says he starboarded his wheel "a spoke or two," which involved a very slight change. Maybe thereafter he straightened up again. But he says he blew the two-blast whistle when he was off Catherine street, and that the North America was then about a quarter of a mile further up. The Erin was then to the westward of the North America—the lowest estimate is 30 feet. When the tugs passed each other they were only 50 to 75 feet apart, as the Erin admits; less than that, as the North America contends. Manifestly, in the time during which the quarter-mile was covered by both, the Erin had not shifted substantially to the westward. She could have done so promptly on giving the signal, because the docking steamer was then some distance above her ("way up by me, way up clear when she began to turn"), and, having got further to the westward, could have waited until the docking steamer passed in towards her berth. The Erin did not fulfill the whole obligation she assumed when she gave the two-blast signal.

It is contended that the North America was not herself free from fault. Having responded with a two-blast whistle, it was her duty to do what she could to assist a passing starboard to starboard. Of

course, so long as the Brooklyn steamer remained a factor in the situation, she could do but little. Her master starboarded his wheel slightly before he reached the steamer, and then straightened, passing the steamer "about 50 feet clear." He could do no more until after he had passed her sufficiently to be free to move further to the eastward.

Counsel for the Erin insists that the North America had passed the Brooklyn steamer before the tugs passed each other, and that she was free to swing to starboard, which concededly she did not do. The evidence, however, is not clear upon this branch of the case, and we are not prepared to differ from the conclusion reached by the district judge, who saw and heard the witnesses.

Decree affirmed, with interest and costs.