## THE TRANSFER NO. 17.

### (Circuit Court of Appeals, Second Circuit.   November 13, 1918.)

#### No. 7.

1. COLLISION ⬅106—COLLISION RULES—WHAT GOVERNS.
    A vessel coming out of her slip and maneuvering to get on her course, or one maneuvering to get into her slip, is not on any course, and the steering and sailing rules do not apply, but article 27 of the Inland Regulations (Comp. St. § 7901), which is the special circumstance rule, is applicable.

2. COLLISION ⬅106—LOOKOUT—NECESSITY.
    Where the master of a tug, which was maneuvering to push its floats up the river, so as to berth them, would have known of the perilous situation as another tug was maneuvering in the vicinity, if proper lookout was kept, the first tug cannot escape liability on the ground that the master was not at fault for not sooner discovering the situation.

3. COLLISION ⬅106—VESSEL AT FAULT—LIABILITY.
    Libelant's tug, which, with its tow attempted to squeeze in behind the stern of a second tug, which was attempting to push her floats up the river so as to berth them, etc., *held* at fault for the collision, and the second tug also was at fault for beginning its maneuver, without regard to the presence of libelant's tug, which could plainly be seen if lookout was kept.

Appeal from the District Court of the United States for the Eastern District of New York.

Libel by the Lehigh Valley Transportation Company against the steam tug Transfer No. 17, her engines, etc., claimed by the New York,

New Haven & Hartford Railroad Company. There was a decree dismissing the libel, and libelant appeals. Reversed, with directions to reinstate the libel and enter a decree for half damages against the steam tug Transfer No. 17.

This is an appeal from a decree dismissing a libel of the Lehigh Valley Transportation Company, as owner of the tug Geneva, to recover damages sustained by the Geneva as a result of a collision which occurred on July 13, 1913, in the North River, off the Lehigh Valley Terminal at Jersey City, at about 4:30 a. m.

The libelant is a corporation organized and existing under the laws of the state of New Jersey, and it is conceded that the Lehigh Valley Transportation Company and the Lehigh Valley Railroad Company are one and the same: the Railroad Company being the owner of the Transportation Company.

An answer was filed by the New York, New Haven & Hartford Railroad Company, as claimant of the steam tug Transfer No. 17, in which it was alleged that the collision and damage complained of were not caused or contributed to by any fault of those in charge of Transfer No. 17, but was due wholly to the fault and negligence of the tug Geneva.

Harrington, Bigham & Englar, of New York City (T. Catesby Jones, of New York City, of counsel), for appellant.

Charles M. Sheafe, Jr., of New York City, for appellee.

Before WARD, ROGERS, and MANTON, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). [1] This collision occurred in daylight, when everything was in plain view, and there was no difficulty in seeing. Daylight collisions do not occur without fault on the part of one, and sometimes of both, vessels. In the present case the District Judge has found that the Geneva was at fault, but that Transfer No. 17 was not at fault, and on that account the libel was dismissed.

This is a case of special circumstances under article 27 of the Inland Regulations (Act June 7, 1897, c. 4, § 1, 30 Stat. 102 [Comp. St. § 7901]), which is found in the margin.[1] In the William A. Jamison, 241 Fed. 950, 154 C. C. A. 586, this court declared that a vessel coming out of her slip and maneuvering to get on her course, or one maneuvering to get into her slip, is not navigating upon any course, and the steering and sailing rules do not apply. In this case Transfer No. 17 was maneuvering to get her floats into their slip, and the Geneva, which had just come out of a slip, was floating down with the tide to get into another slip, in close proximity, but had not actually begun the maneuver of entering the slip. It was the duty of each of these vessels to act with prudence. And the question is: Did they do it?

[2, 3] Transfer No. 17, with car float No. 48 on her port side and car float No. 39 on her starboard side, arrived at the Bridges at the Lehigh Valley Railroad Terminal at Jersey City on the morning of July 15th at about 1 o'clock. She found the Bridges all full, and lay outside until 3 a. m., when she was ordered to put the floats into Bridges 5 and 6, respectively. Two unsuccessful attempts to do this

---

[1] "Article 27. In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

were made, and the time from 3 o'clock until the collision occurred was spent in getting the floats into position for entering the Bridges because of the unusually strong ebb tide. At about 4 o'clock the Transfer had the floats in a position where the tow of the float upon her port hand was against the outer end of the rack between Bridges 5 and 6. The bow of the outer float upon the starboard side was against the southerly side of Pier A, or close to it. The two floats were held together at the bow by a line, and another line ran from the starboard float bow to Pier A. The Transfer was backed out from between the two floats, and had her bow against the stern of the port float, in order to push the floats around and up the river, with the idea that the floats would be separated by letting out the cross-line and would "split" on the center pin, and with the idea of shoving the two floats into those Bridges when they reached a position where they could be forced in. The floats were 320 feet long and lying at an angle across the entrance of the Bridges. There was a float in Bridge No. 4, which was 234 feet in length, and the floats of the Transfer rested against the ends of this float in Bridge No. 4, and the latter float projected about 50 feet beyond the end of the rack between Bridges 4 and 5. The result was that the floats of the Transfer to a considerable extent locked the entrance to Bridge 1.

The steam tug Geneva had taken in tow on her port side on this same morning and at about 4 o'clock a Lehigh Valley car float which she was to put into Bridge No. 1. The tug had come out of the Morris Canal Gap which was north of where Transfer No. 17 was lying. The Geneva backed out from the upper side of Pier A into the river, and got her float upon her starboard side, and the tug and float were on a line substantially up and down the river. The Geneva then started to drop down with the tide, there being a very strong ebb tide. The captain of the Geneva testified that when he got out into the river and swung the float around he judged he was about 250 feet from the end of the pier and that he was out far enough to clear the floats by 100 feet, if not more, if Transfer No. 17 had remained at rest. Before he came out from Pier A he knew of the position of Transfer No. 17. After he got out into the river and was drifting down he says Transfer No. 17 started to push her floats up the river and that the out-river end of the float swung up in an arc of a circle. He claimed that he immediately blew an alarm and started his engine at once straight ahead, "hooked up to try to get away from him (Transfer No. 17), to get further up the river." Prior to this attempt of Transfer No. 17 to push her floats up the river the Geneva evidently intended to drop down and pass as close behind the stern of the New Haven floats as might be, and then attempt to shove her own float up and into Bridge 1. But in carrying out such a maneuver the duty was clearly upon the Geneva not to attempt to squeeze in behind the stern of Transfer No. 17 by a slight margin of safety and without indicating her navigation and making known that she desired the Transfer to remain still until she had passed. And as a matter of fact there was nothing in the river which would have prevented the Geneva from going out a little further into the stream instead of trying to pass under the stern of the Transfer and in such

close proximity thereto. If the Transfer had remained stationary, it is by no means certain that the Geneva could have succeeded in the maneuver she contemplated. Some of the witnesses testified that the Geneva could not have accomplished it on an ebb tide, as she was a small boat, and did not have sufficient power to accomplish such a result. The captain of the Geneva, before he came out of his slip, had seen Transfer No. 17 maneuvering unsuccessfully to bridge her floats, and after he got out into the river he looked again at her, and saw she was at right angles on the stern of the float. He admitted that he did not observe the movements the Transfer was about to make, and that he acted without any reference to those movements. In so doing he certainly did not act with the prudence the law required, and the liability of the Geneva is undoubted.

The court, however, does not agree with the District Judge in his conclusion that no blame can be attached to Transfer No. 17. If the Geneva started down the river after No. 17 had begun to shove her floats up, as the District Judge has found, there would be a great deal to be said in favor of his exoneration of No. 17; but as we read the evidence it has convinced us that the Transfer began to shove after the Geneva started drifting down the river. The master of the Luzerne, who witnessed the collision, testified that after he saw the Geneva in the river, and drifting down with the tide, Transfer No. 17 started shoving the floats up, and that they were shoved quite a distance before the Geneva blew her alarm, which the New Haven tug answered. He was asked whether the New Haven tug (Transfer No. 17) stopped after the alarm was blown, and he was very positive she did not. He formed his opinion from the action of the water from the tugboat and from the bells, which he could hear being rung from the pilot house of the tug. The master of No. 17 testified that he saw the Geneva when he started to push the floats in, and that she was then out in the river dropping back. At a subsequent time he was asked whether he had gotten under way when he first saw the Geneva, and he replied, "Just starting to shove the floats up when I saw her." Afterwards he said he did not see her before he started to move the floats. "I had started to move the floats when I first saw her." When he started to push the floats into the river, it was necessary for him to swing between four and six points of the compass, and he was asked whether, before he started a maneuver of that sort, he would count himself a prudent man unless he looked to see what other boats there were in the river. He replied, "Well, it probably would be imprudent if I didn't look." He claimed, however, that he did look, and was asked, "How is it that you didn't see her when you first started out?" To this he replied, "Well, I don't know." Afterwards he was asked how long he had been shoving on his floats when he first saw the Geneva. His reply was, "A very short interval of time, possibly 10 or 15 seconds." The Geneva must have been in plain view when Transfer No. 17 began the maneuver which resulted in this collision. If the captain of No. 17 did not discover her before he commenced the maneuver, it must have been because he did not look, and if he began it without looking he was at fault. He was in like manner at fault if he began his maneuver, as we think he did, after the

Geneva was out in the river and dropping down with the tide. If it could possibly be claimed that the master of No. 17 was not at fault for not sooner discovering the situation, the answer must be that the Transfer was at fault because of the absence of a lookout to give warning seasonably of the close proximity of the Geneva. Wolcott v. Union Ferry Co. of New York & Brooklyn, 225 Fed. 40, 140 C. C. A. 366; The William A. Jamison, supra. In any view it is possible to take, it seems to us that there was a lack of prudence as well on the part of Transfer No. 17 as on the part of the Geneva.

The decree dismissing the libel is reversed, and the court below is directed to reinstate the libel and enter a decree for half damages against the steam tug Transfer No. 17.