## THE H. L. BOND.

## THE NEW YORK CENTRAL NO. 3.

District Court, S. D. New York.
Dec. 10, 1926.

Leo J. Curren, of New York City, for libelant.

Bigham, Englar & Jones, of New York City, for claimant New York Cent. R. Co.

Macklin, Brown & Van Wyck, of New York City, for claimant Baltimore & O. R. Co.

## AUGUSTUS N. HAND, District Judge.

On January 27, 1923, the steam tug Mc-Williams, bound from New Haven to the Blue Line Stakeboat off Staten Island, New York Bay, was proceeding down the East River with a hawser tow of eight light barges in four tiers of two boats each. The G. K. Mellen, libelant's barge, was the starboard boat in the last tier. The tide was ebb. This tow had proceeded in the East River to a point just below Corlears Hook, when the New York Central Steam Tug No. 3, with a car float on her port side, overtook the Blue Line tow and came along about abreast of it and about 100 feet to the starboard. The Blue Line tow was in the middle of the East River when the Baltimore & Ohio tug, the H. L. Bond, with a car float on each side, was seen coming up the river just above the Brooklyn Bridge. The Blue Line tow was from about seven to eight hundred feet from the New York shore with No. 3 and her float 100 feet to the starboard of it, while the H. L. Bond and her tow were much nearer the New York shore. The captain of the tug No. 3 slowed down and blew two whistles when about abreast of Pier 40, East River. These the tug H. L. Bond answered. The H. L. Bond and her car floats were on the west side of the river, because it is easier to go up the river on that side against an ebb tide. Nevertheless, this was a violation of the rule, and gives rise to a presumption of fault. The Black Diamond (C. C. A.) 273 F. 811.

It is said that the No. 3 should not have blown two whistles indicating a passage to the starboard of Tug No. 3 and her floats, but should herself have proceeded to starboard. If she had done this, it would have forced the Bond and her float to cross the bows not only of No. 3, but of the Blue Line tug and tow. This would have been dangerous, if not impossible, when the Blue Line's tow, as well as the No. 3 and her float, were coming down on an ebb tide and were not really far away. I am inclined to think that the No. 3 did the best she could in a situation which arose from the failure of the H. L. Bond to observe the rules of navigation, and was much more prudent in attempting to accept the bad situation and allow the H. L. Bond to pass on her starboard side than in seeking to force her over to the east side of the river. Unfortunately the crew of the H. L. Bond, through death and other causes, have become unavailable as witnesses except for a deck hand, who did not see the collision but came out on deck when he felt it.

The master of the No. 3 testified that, after he blew his two whistles, the Bond at first did not alter her course, but finally went hard-a-starboard and swung her starboard float against the starboard corner of his float, which was thereby pivoted over so that it struck the starboard side of the libelant's barge. It is perfectly evident that No. 3 and her float must have got well over toward the Blue Line's tow and quite as far as was safe, else the collision of No. 3's barge with the starboard float of the Bond would not have been sufficient to shove the car float of No. 3 against the libelant's barge. It must therefore necessarily be inferred, either that there was not room enough in the beginning for the tows to pass one another on the west side of the river, or that the Bond navigated negligently. There is really no available testimony on behalf of the Bond except the statement of her deck hand that when he came on deck after the collision his port float was only from 20 to 40 feet offshore. This, proctors for the Bond say, shows that the proposal of No. 3 was initially dangerous and improper, and she should have fallen back instead of proposing a starboard to starboard passage. It was difficult for a tug carrying a car float to fall back in an ebb tide. She could only fall back by reversing, and, had she reversed when 100 feet away from the Blue Line tow, she would probably have caused her barge to collide with that tow. In the circumstances, I think that No. 3 proposed the mode of navigation which offered the best chance of safety, that she got as far over to the east and as near the Blue Line tow as she safely could, and that the collision was caused by the failure of the Bond to proceed promptly to starboard as soon as she heard and acceded to the two-whistle signal. Instead of that, she at first failed to change her course to port and then went hard-a-starboard, swinging out her starboard barge so that it collided with the float of No. 3. Had the Bond gone to starboard sooner, or straightened up more when she finally starboarded, or had she done both, she would, in my opinion, have avoided the accident. At any rate when her disregard of rules of navigation created the situation, without which no accident could have occurred, a presumption of negligence arose, and she has shown nothing definite enough to shift the blame upon No. 3 or to require a division of damages.

The libel is accordingly dismissed as to No. 3, and an interlocutory decree for libelant is granted against the tug H. L. Bond.