COMMONWEALTH & DOMINION LINE, Limited, v. UNITED STATES.

UNITED STATES v. COMMONWEALTH & DOMINION LINE, Limited.

Circuit Court of Appeals, Second Circuit. July 19, 1927.

No. 300.

**1. Collision ⬥92—Government-owned collier held at fault in collision with vessel entering channel from between anchored ships.**

Government-owned steam collier *held* at fault in collision with steamship coming into channel from between anchored vessels waiting their turn in convoy.

**2. Collision ⬥35—Ship is on "steady course" when her future positions are certainly ascertainable from present position and movements, though heading may change.**

A ship is on a "steady course," not only when her heading does not change, but whenever her future positions are certainly ascertainable from her present position and movements; hence a steady course may involve many changes of heading, if they can be accurately foretold.

**3. Collision ⬥35—Of vessels on steady course, the one having the other on her starboard must give right of way.**

Of two vessels meeting on a steady course, the one having the other on her starboard hand must give right of way and keep out of way.

**4. United States ⬥110—Government, liable for collision of steam collier, held liable for interest under special act authorizing suit; "demurrage."**

Where government-owned steam collier was responsible for collision with steamship, government was liable for interest or amount of recovery, though special act authorizing suit limited recovery "to * * * damages suffered other than claims for demurrage"; demurrage not being inclusive of interest on damages suffered, but rather the loss of the vessel's use while under repair.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Demurrage.]

Appeal from the District Court of the United States for the Eastern District of New York.

Libel by the Commonwealth & Dominion Line, Limited, owner of the steamship Port Phillip against the United States, as owner of the steam collier Proteus, wherein the United

States filed cross-libel. From a decree for libelant, the United States appealed. Decree modified, and, as modified, affirmed.

Appeal by the United States from a decree of the District Court for the Eastern District of New York holding solely at fault the steamship Proteus for a collision with the steamship Port Phillip in the waters of the Lower Bay in the port of New York.

On October 16, 1918, the eastern part of the Lower Bay above the north end of Ambrose Channel was filled with some 15 or 20 ships at anchor, waiting their turn in convoy to carry merchandise to Europe. The last buoy on the eastern boundary of that channel is about southwest of the end of Norton Point, Coney Island, and the boundary line, if projected northwards, would fall close to the bell buoy off Fort Hamilton. This was the limit of the anchorage grounds, from which the nearest ships were anchored some 500 or 600 feet off, so as not to swing in the tide across the line to the embarrassment of navigation.

The Proteus, a United States collier, 522 feet long, entered the Ambrose Channel that morning at a speed of about 12½ knots, and steamed up on the easterly side of the channel at a distance from the marking buoys variously estimated by the witnesses. At a point about opposite Norton Point, she came into collision with the Port Phillip, which had come out between two anchored steamers and was headed across the channel, down which she meant to steam on her way to join her convoy. The bow of the Proteus struck the port quarter of the Port Phillip about 30 feet forward of her stern at an angle of about 70 degrees, and did such damage that she sank within 10 minutes, before she could be beached on the West Bank.

The Port Phillip had been at anchor on the anchorage ground some distance south of the point of collision. Having been notified that day that she was to join a convoy, she flew a convoy signal, then customary in such cases, weighed anchor, and, being headed northward on the ebb tide, got under way at slow speed, so as to pick her way among the anchored ships that surrounded her. Coming opposite an opening between two anchored vessels nearest the channel, she starboarded and waited to let several vessels pass down the channel ahead of her; then hard-astarboarding she came full around, so as to head through the opening and across the channel. At this time, 10:10, her engines were put full speed ahead. This course she

maintained substantially unchanged until the collision, which occurred somewhere in the channel at 10:15.

As is usual in such cases, the signals and positions of the vessels were much disputed at the trial. However, both admitted that when the Proteus first saw the Port Phillip as her bow began to come out from between the two anchored ships, she blew twice and her bridge gave the order to starboard. Shortly thereafter she hard-aported and swung to starboard, coming into collision. That she was in reverse at the time is conceded, but her speed was probably not very much reduced, since the collision cut deeply into the other vessel. The Proteus contended that the Port Phillip first answered her double blast with one, and later blew a backing signal and reversed her engines. The Port Phillip contended that she gave the Proteus four separate signals of one blast each, beginning at the moment when she came out between the vessels, to the last of which alone the Proteus answered with her two-blast signal, which she in turn answered with a single blast. She denied that she blew a backing signal at any time, or that she ever reversed her engines. The Proteus put the place of collision on the easterly edge of the anchorage ground; the Port Phillip at least 1,000 feet further west.

The District Court, who heard most of the Port Phillip's witnesses, though only the master of the Proteus, found that the Port Phillip had given the signals which she said she had, held that the starboard hand rule applied, that the Port Phillip was without fault, and that the Proteus was at fault for failing to keep a sharp lookout, for trying to cross the Port Phillip's bows, and for keeping on instead of at once backing, if she could not pass under her stern. He did not find the precise place in the channel where the collision occurred.

Emory R. Buckner, U. S. Atty., and Charles E. Wythe, Sp. Asst. U. S. Atty., both of New York City, for the Proteus.

Lord, Day & Lord, Allan B. A. Bradley, and George De Forest Lord, all of New York City, for the Port Phillip.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge. [1] The Port Phillip had been in motion for at least 15 minutes before the collision, during all of which time she was or ought to have been plainly visible to the Proteus. The suggestion that the cluster of anchored ships in which she

moved prevented this is quite without merit. True, her movement was slow, but even a slowly moving ship may be detected among others at anchor, indeed more readily than when she is alone. Her motion becomes the more evident because of the vessels close beside her, and the idea that they could blot her out is incredible. The further to the eastward the course of the Proteus lay, the more imperative was the duty of her lookout, for common caution should have anticipated that among so many ships one might be moving out to a convoy. To confess that she only saw the Port Phillip as her bows came out from between the vessels further west, was to admit at least one serious fault.

[2, 3] But her faults did not stop there. When the Port Phillip did come out she was the privileged ship; it was a crossing case. The effort to make it one of special circumstances depends upon the assertion that the Port Phillip was not on a steady course. The Washington, 241 F. 952 (C. C. A. 2); The Transfer No. 17, 254 F. 673 (C. C. A. 2); The Newark, 289 F. 801 (C. C. A. 2). It involves a misconception of the meaning of that phrase. A ship is on a steady course, not only when her heading does not change, but whenever her future positions are certainly ascertainable from her present position and movements. A steady course may thus involve many changes of heading; it is enough if these can with accuracy be foretold. If they can, so that at any given time in the future her position can be ascertained, she is on a course, and if that course crosses the course of another vessel, who holds her on her starboard hand, the latter must keep out of her way. Whether the way be sinuous, or the speed variable, makes no difference, so it be plainly disclosed. It is well settled that this applies to head-on cases in a winding channel. The Victory, 168 U. S. 410, 419, 421, 18 S. Ct. 149, 42 L. Ed. 519; The Arrow, 214 F. 743, 745 (C. C. A. 2). The rule is the same in England. The Velocity, L. R. 3 P. C. 44; The Pekin, [1897] L. R. App. Cas. 532. The Roanoke, 11 Asp. M. C. 253 (C. A.), applied it as well to a crossing case, where the privileged vessel was held without fault, though she stopped to take on a pilot, that maneuver being apparent from her position and course.

The Port Phillip's movements might have been fairly evident to the Proteus from the moment she weighed anchor, if her lookout had done his duty. She carried a convoy signal, and could hardly have had any other intent than to come into the channel and steam down the bay. However, if it be thought that this is too much to imply from the signal alone, she had headed westerly between the anchored ships plainly bent upon entering the channel for five minutes before the collision, beginning at a time when the Proteus was necessarily over a mile away. For that period her heading did not change, and the Proteus' duty was fixed from then on, whatever it had been before. She had plenty of opportunity to discharge that duty and her failure was without excuse. The Port Phillip, on the other hand, had a duty to keep her course and speed, which she did. We accept the finding that she at no time reversed, supported as it is by the testimony of her crew, though her log was sunk with her. It is true that the witnesses on the Proteus all say that she blew a backing signal after getting the Proteus' single blast. The probabilities are all against such navigation. It is agreed that the Port Phillip by her answer, if a single blast, refused the Proteus' proposal to cross her bows. This meant that she expected the Proteus to go under her stern. To back under such circumstances would have been in direct contradiction of her indicated purpose; we do not believe that her bridge so far lost their heads.

Thus it seems to us of little consequence just where the collision took place, or where in the channel the Proteus was coming up. In fact, the great weight of testimony puts it at least 1,000 feet away from the anchored vessels, which gave room for the Proteus to port under the Port Phillip's stern, had she acted with decision. On her own version she vacillated, due no doubt to her surprise at the emergency suddenly thrust upon her. How much that vacillation contributed to the result it is quite impossible to say, for its extent is in sharp dispute, and the District Judge, though he has found that the Proteus did first fall off to port, has not said how much. The extremes on either side are probably incorrect. Certainly there was the strongest possible motive for each to press or eliminate the effect of this feature of the case. At any rate it is conceded that there was a delay in porting, and, as the ships nearly cleared, a very short delay may have been critical. It is plain that this may account for the failure of the Proteus to accomplish her duty in spite of an ample berth in which to do so.

As is common in such cases, the advocates have prepared elaborate calculations based upon the testimony, and each proving his own case. We cannot take these very seri-

ously; based as they must be upon biased recollection of exciting events not capable of accurate record. It is true that the speeds of the two vessels are established; they were as five is to two, for the tide, as in all such cases, is a factor common to both and must be disregarded. All we can see in these endeavors is that the Proteus must be put further to the south when she first sighted the Port Phillip, in proportion as we move the collision further to the west. Nothing follows from this except to discredit one estimate of distance or the other, when all are notoriously unreliable.

We take but two examples. If the collision was 1,000 feet from the anchored vessels, when the stern of the Port Phillip passed between them the bow of the Proteus was a little less than 2,500 feet to the south of the point of collision. There is no impossibility in that. If we fix the collision at 1,500 feet from the same line, the Proteus' distance becomes somewhat more than 3,500 feet. We need only accept a small part of the equivocal maneuvering of the Proteus to account for the collision even after she had traveled so far. Moreover, it seems to us, if we are to allow any seamanship to Hansen, that he must have been a good distance to the west of the anchored ships when he tried to cross the Port Phillip's bows. Had he been 2,000 feet to the south, and yet close to the eastern edge of the channel, it was foolhardy to try what he did.

The most probable explanation is that the Proteus through inattention was suddenly faced with a ship on her starboard hand, whose speed and course she could not at once appraise. The natural instinct to turn away from danger suggested to her a starboard helm, though this was contrary to her duty. When the situation became clearer and the Port Phillip rejected the proposal, she tried to remedy her initial blunder by hard-aporting, but it was then too late. In such a situation we should not be jealous to find faults in the other ship, under well-settled rules.

Of the faults charged against the Port Phillip the most plausible is her asserted failure to keep the Proteus constantly in view after she first sighted her far down the channel, when she herself was leaving her moorings. It is possible that she did not keep her under observation. This might be a serious matter in other situations, but here we think that it was not. Knowing her own proposed course, she must have known that she would be on the Proteus' starboard hand when the time for action arrived, and she was

quite within her rights in assuming that the Proteus would be prepared to do her duty at that time. She had no alternative in any case but to keep her course and speed, and her actual movements should have been exactly what they were, had her lookout done nothing but fix his eyes on the Proteus from the moment she was first seen. It can therefore be said that, even if the fault be taken as proved, it could have had no effect in the result. The suggestion that she should have waited till the Proteus at 12½ knots had passed up the channel is too unreasonable for discussion. The notion that the situation required something in the nature of a slip whistle has no basis in the books.

There remains only the question whether she should have given the alarm when the Proteus blew to her twice. The Proteus' intentions were certainly clear as soon as she blew. It was a proposal to cross the Port Phillip's bows. That proposal she rejected, though she need not have done so, and the Proteus, as in duty bound, hard-aported. If she heard the accompanying single blast, which she denies, the Proteus' course was again evident to her. If she did not, then the rule might apply, but she had, even so, nothing to do but to keep on as fast as possible, and it is entirely clear that an alarm would have done nothing to change the movements of the Proteus, which was then tardily doing what she could to avoid the disaster. Therefore, even granting the two charges made against her, which we accept as such only for the sake of argument, they could not have contributed to the collision. In any case, the Proteus was far too gravely involved to stand upon such problematical derelictions.

[4] The District Judge refused to allow interest, our decision in The Esperanza, 16 F.(2d) 945, not being then decided. A distinction is raised, in that the special act of Congress allowing this suit permits a recovery "to the extent only of * * * damages suffered other than claims for demurrage to said vessel." "Demurrage" does not mean interest on the "damages suffered," but the loss of the vessel's use while under repair. It is true that there could be no demurrage here, because the Port Phillip sank, and this circumstance the United States seizes upon as indicating that the word must mean interest. It must be conceded that the limitation has no application to this case, but it is so inapt to cover interest on the damages that we cannot suppose it to have been used in that sense. Moreover, we are to assume, until the contrary is shown, that the United

States meant to do full justice to the wronged owner.

Decree modified, by allowing interest, and, as modified, affirmed.