**THE TRANSFER NO. 6.**

**PENNSYLVANIA R. CO. v. NEW YORK, N. H. & H. R. CO.**

**No. 24.**

Circuit Court of Appeals, Second Circuit.

Dec. 1, 1930.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and P. Fearson Shortridge, both of New York City, of counsel), for appellant.

Haight, Smith, Griffin & Deming, of New York City (Henry M. Hewitt and James Mc-Kown, Jr., both of New York City, of counsel), for appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The Pennsylvania Railroad Tug No. 16 left North Fourth street, Brooklyn, about 8 o'clock in the morning of February 25, 1926, bound for Pier 8, East River, in the vicinity of the Battery. The weather was fair, with a slight eastwardly breeze, and the tide high water slack. No. 16 had reached a point in the river about opposite Corlears Hook and about 450 to 500 feet off the New York piers, when she sighted the New Haven steam tug Transfer No. 6, which had left Pier 39 and was bound up the river for 112th street. No. 6 was then about 100 feet to the east and abreast of the United States government drill that lay opposite Jackson street, New York, and about 300 feet from the New York shore. The drill was anchored more than a quarter of a mile below Corlears Hook. A Lehigh Valley tow was proceeding down the river ahead of No. 16 but between the drill and the New York shore. The steam tug Socony, with an oil barge on her port side, was proceeding up the river about 75 feet to the east of Transfer No. 6, and just ahead of her. Ahead of and just outside of the Socony was another tow going up the river. Under these conditions, the Pennsylvania Tug No. 16 blew a two-blast signal to Transfer No. 6, which No. 6 answered by a like signal. By a regulation of the War Department, vessels were not to go within 100 feet of the drill. The master of No. 16 expected to pass between No. 6 and the Socony tow after No. 6 should pass beyond the drill. When the signals were exchanged, No. 16 starboarded, though not much, as the Socony was not far enough to the east to make further movement to port safe, and then straightened up. No. 6 practically kept her course, instead of going sharply to port aft-

er she had passed the drill, and collided with the starboard bow of No. 16, causing the damage for which the libel was filed.

No. 16 had but one of her engines in use, and was coming down the river at only 6 knots. When No. 6 answered the two-blast signal, she slowed down so that both vessels were proceeding at a moderate rate of speed before they reached a place of danger. No. 16 expected No. 6 to go to port as soon as she got above the drill, and, when she failed to do this, and was at a distance of about 500 feet from No. 16, blew an alarm and stopped her engines. Shortly thereafter she blew another alarm and reversed. No. 6 also was backing at the time of the collision. The master of No. 6 said that the place of collision was off the upper end of the drill, whereas the master of No. 16 said it was 300 feet farther up the river, and the deckhand of No. 16 located it at 200 feet above the drill. The master of No. 6 admitted that his tug had once passed above the drill, but explained his story that the collision was at the upper end of the drill by saying: "I stopped my boat and I backed and when we collided I was * * * back to the drill again."

It is hard to see how a tug like No. 6 could be abreast of the drill when she first exchanged signals and not be full clear of it long before the collision. No. 16 had a distance of about 1,500 feet to traverse between the giving of her signal and any place of collision suggested by counsel, whereas the advance of No. 6, even to a point 300 feet above the drill, was nothing like that distance. Indeed, at one point in his testimony, the master of No. 6 said he was "just clearing the upper end of the drill" when he answered the two-blast signal. If this was so, the collision must have been much farther up the river than 300 feet above the drill. In view of the agreement of all witnesses as to the approximate location of No. 6 when the vessels began to navigate with reference to one another, it would seem that the place of collision was at least as much as 300 feet above the drill.

The master of No. 6 said No. 16 was heading toward the Brooklyn shore, and he thought the signal of two whistles meant that she wished him to consent to let him cross her bow. He explained the collision by the fantastic statement that, after he had stopped his engines to let No. 16 pass, she zigzagged down the river, changing her course one way and then another, and, when she was 50 feet off, "took a dive for No. 16." This kind of testimony to excuse a collision is not un-

known. We can only say that it bears no mark of probability.

The trial judge dismissed the libel, holding No. 16 solely at fault "in not slowing down or stopping in a place of safety, but continuing on into waters congested by reason of the drill, Transfer No. 6 and the Standard Oil tow."

■ The most that can be asked for by No. 6 is a division of damages on the ground that No. 16 inaugurated an impracticable and dangerous passage through a congested area, for No. 6 would in such case be at fault in acceding to the course suggested. Moreover, she was always on the wrong side of the river in violation of the East River statute, and was plainly impeding navigation thereby. This raised a presumption of fault which has not been rebutted. The Black Diamond (C. C. A.) 273 F. 811.

■ But the negligent navigation of No. 6 was the sole cause of the collision. She acquiesced in a starboard to starboard passage; yet failed to co-operate with No. 16 in a perfectly practicable maneuver. When she gave her signal, she was by the undisputed testimony either partly alongside of or just clearing the drill, while No. 16 was more than 1,500 feet above her in the river. No. 16 could at no time go much to starboard for fear of collision with the Socony tow. In these circumstances No. 6 could and should have gone forward expeditiously and starboarded or hard-astarboarded as soon as she passed the upper end of the drill. This would have given her time and space within which to get well to the west of No. 16 before the latter got into the pocket between No. 6 and the Socony tow. Instead of doing this, No. 6 slackened her speed so much that according to her own testimony she made almost no progress, and collided with No. 16 not far from the very spot where she originally was when the signals were exchanged. It is true that we find that the point of collision was not less than 300 feet above the drill, but, if No. 6 had navigated properly, she would have been far above that point at the time when the collision occurred. The fact is she seems to have done nothing to facilitate the maneuver to which she had agreed. When she consented to the passage, she knew perfectly well that there was not room for No. 16 to pass safely between herself and the Socony tow if she remained down alongside of or close above the drill. The danger was manifest, the mode of exit plain, and No. 6 was an unincumbered tug having but a short distance to go in order to get out of

the way. We can see no justification for her failing to carry out the maneuver successfully.

The advocates for No. 6 attempt to excuse her conduct in various ways. They say in the first place that it was a starboard hand situation and that No. 6 was the privileged vessel. It is true that, because of the bend in the river below Corlears Hook, No. 16 was at first headed toward the Brooklyn shore and No. 6 was on her starboard hand when the vessels sighted one another, but it is well settled that the course of a vessel is her apparent course and not her heading at any given moment. The Hallgrim (C. C. A.) 20 F.(2d) 720; Commonwealth & Dominion Line, Ltd., v. United States (C. C. A.) 20 F.(2d) 729. The vessels were in fact on meeting courses, and this was well understood by the master of No. 6, as is shown not only by his testimony, but by his acquiescence in a starboard to starboard signal. The Victory, 168 U. S. 410, 18 S. Ct. 149, 42 L. Ed. 519. The apparent course was not across the river.

It is next contended that a starboard to starboard signal should not have been given, because, even if the vessels were on meeting courses, they should have passed port to port, and the proper signal was one blast. But there was not room for No. 16 to pass between No. 6 and the drill as the course of No. 6 lay, and the latter could not alter her course to the east because of the proximity of the Socony tow. It is further suggested that No. 16 ought to have followed the Lehigh Valley tug down on the westerly side of the drill. Perhaps this course would have been better than the one adopted, but the answer to both of these contentions is that No. 16 had proposed a passage which was practicable and to which No. 6 had agreed. She neglected to fulfill her agreement by slowing down so much that she did not get above the drill as quickly as she properly could and as far as she might, and by failing to starboard when it was practicable. For such faults vessels have frequently been held liable. The Nutmeg State (C. C. A.) 67 F. 556; The Erin (C. C. A.) 194 F. 405; The H. L. Bond (D. C.) 46 F.(2d) 345, 1927 A. M. C. 263.

The judge held No. 16 at fault for "not slowing down or stopping in a place of safety but continuing on into waters congested by reason of the drill, Transfer No. 6 and the Standard Oil Tow." In fact, however, she never went at an excessive rate of speed or even continued the speed of 6 knots after it appeared that No. 6 was not going to carry out the maneuver to which she had agreed. It was to be naturally expected that No. 6 would starboard when she had passed the upper end of the drill, and No. 16 had a right to suppose that she would do this. No. 16 blew an alarm and stopped her engines at a distance of 500 feet from No. 6 and as soon as she found that the agreement was not to be complied with. Shortly after this she blew a second alarm and backed. In thus acting No. 16 satisfied her legal obligations. No. 16 was justified in assuming that No. 6 would carry out her agreement and would navigate accordingly until it was apparent that she would not do this. The Nutmeg State (C. C. A.) 67 F. 556; Lake Erie Transp. Co. v. Gilchrist Transp. Co. (C. C. A.) 142 F. 89. In any event, we are clear that the master of the No. 16 exercised his best judgment in extremis, and that she should not be required to contribute to the damages suffered when No. 6 failed to navigate with ordinary skill and thereby brought about a situation where it was at the last minute perhaps difficult to determine just what it was best to do.

The decree is reversed.