## THE CARISCO.

### THE POLING BROS. NO. 6.

### THAMES RIVER LINE v. CHESTER A. POLING, Inc.

### CHESTER A. POLING, Inc., v. THAMES RIVER LINE.

### Nos. 13894, 13931.

District Court, E. D. New York.

March 9, 1934.

Purdy & Purdy, of New York City (John E. Purdy, of New York City, of counsel), for Thames River Line.

Alexander, Ash & Jones, of New York City (Edward Ash, of New York City, of counsel), for Chester A. Poling.

GALSTON, District Judge.

These are cross-libels and on stipulation were tried together.

On July 1, 1933, at about 8 o'clock p. m., the steamer Carisco left New York bound for Connecticut. Going towards Hell Gate the steamer took the easterly channel past Blackwell's Island. As the vessel passed the easterly point of Blackwell's Island, a heavy wind and rainstorm were encountered. Abreast of the Broadway Ferry, a bend whistle signal was given, and the vessel slowed down. Presently another bend whistle was heard which came from a New Haven tug having a pair of floats in tow. Single whistles were exchanged and the vessels passed port to port. The Carisco, having stopped before, started up, and as the vessel neared Hallet's Point, the master, seeing a red light ahead on the vessel which later proved to be the Poling No. 6, blew one whistle. This signal was not answered. Another single whistle was given, which also was not answered. Then alarm and backing signals were given and the engines reversed. This maneuver, however, did not avoid the collision. Apparently, the collision was about at right angles, the Poling striking the stem of the Carisco, bending the stem above the deck from starboard to port. According to Sherman, the master of the Carisco, up to the time of the collision, he did not see the Poling change her course. Indeed, the master of the Poling admits as much.

At the time the storm was very severe with poor visibility except during the flashes of lightning. Objects could be seen only one hundred feet away. The wind was blowing from northwest to northeast in a severe whirl. There was a strong ebb tide running from five and a half to six knots.

At the time that the Carisco passed the New Haven tug and float, the Carisco was one hundred and fifty feet off the Astoria shore; and the distance between the port side of the Carisco and the port float in tow of the Transfer No. 15 was about two hundred feet.

The Poling, therefore, had the wind on her starboard side coming with the tide. The Carisco was bucking the tide and was sufficiently far off the Astoria shore to feel its

effect. The difference in the heading of the Carisco at the time that the Poling was first observed and at the time of the collision was brought about through the effort of her master to back away, which gave her a swing to port.

It seems that the Carisco was steering a proper course as she came up to Hell Gate, for it was customary, going east against the ebb tide below Hallet's Point, to keep off about one hundred and fifty feet, get some of the slack and also some of the eddy. Vessels in that position should be free from interference with any traffic coming down the river.

The version of the accident as given by those on the Carisco, in so far as the maneuvers of the Carisco were concerned, is corroborated to some extent by the captain of the New Haven tug. Coming down the river he blew a bend whistle at Pott's Cove and also heard one coming from the other side at Hallet's Point. He also heard fog signals. Sighting the Carisco off the Astoria shore, he said she was about one hundred and fifty feet therefrom. They exchanged one-whistle signals and passed port to port, about two hundred feet separating them. He heard no whistle from any other vessel in the vicinity. Momentarily, after passing the Carisco, he heard an alarm whistle given by the Carisco and three backing whistles.

The Poling contends that when the vessels first sighted each other there was opportunity and room for the vessels to effect a port to port passing, and that it was the intention of their masters so to do. The Poling attributes the collision to the fact that the Carisco, within a distance of three hundred feet of the Poling, executed a sheer to her own port which brought her at right angles to her prior course.

■ This so-called sheer, however, is adequately explained. When the Poling's one-whistle signal was sounded and her wheel ported and the signal repeated and unanswered, she was compelled to give an alarm and backing signal. In thus reversing, her headway was killed and her bow swung to port in the strong tide. Prior to the backing, she had been swinging to starboard. That it was her duty to stop in the presence of danger and attempt to avoid collision by backing seems reasonably clear. Had she proceeded on her course, she could not have avoided collision, although doubtless there would have been a different angle of contact.

■ It is urged also that the Poling was the privileged vessel. Sherman, the master of the Carisco, testified that when he first observed the Poling she was on the Carisco's starboard bow; that the Poling had the right of way and that it was the duty of the Carisco to pass under the stern of the Poling. Reliance is had on article 19 of the Inland Rules (33 USCA § 204), which provides that when two vessels are crossing, the vessel which has the other on her own starboard side shall keep out of the way. Needt, the master of the Poling, evidently had this in mind, for he testified:

"Q. While you were going from point K up to point Y, which was the point of collision, you saw him come from point L on an absolutely straight course without changing in the slightest, is that right? A. Yes.

"Q. And you held your course and speed? A. Yes.

"Q. You made no change in your helm, and you didn't back your boat until a half a minute before the collision, is that right? A. That is right.

"Q. That is the way it happened, is it? You considered you had the right of way this morning, didn't you? A. Yes, sir.

"Q. Because the other boat was on your port hand? A. Yes, sir.

"Q. And you held your course and speed, and you were going to let him look out for himself, weren't you? A. Yes, sir.

"Q. You knew that if the Carisco backed the tide would affect her starboard bow, did you not? A. Well, I don't know what the Carisco was doing at the time. I didn't figure on whether he was going to swing around, I thought he was going to carry past my stern.

"Q. You took the position that he was on your port side? A. Yes, sir.

"Q. You had the right-of-way and it was up to him to keep clear of you? A. Yes, sir."

Reference to the chart, however, shows that the starboard hand rule should not prevail in this case. Headings should not be confounded with true courses. The sinuosities of the channel should have been well within the knowledge of the master of the Poling, and he should have understood that in view of the direction of the channel curving courses had to be followed, and that consequently the situation was not one of crossing but of meeting vessels. The Transfer No. 6 (C. C. A.) 45 F.(2d) 571; The Hallgrim (C. C. A.) 20 F.(2d) 720, 721; The Victory, 168 U. S. 410, 18 S. Ct. 149, 42 L. Ed. 519. See, also, Commonwealth & Do-

minion Line v. United States (C. C. A.) 20 F.(2d) 729.

I think it must follow that the collision arose because of the misconception by those on the Poling as to what navigation rules were applicable. The Poling held her course and speed. This she should not have done. The positions clearly indicated, when the vessels sighted each other, one going down the river and the other bound through Hell Gate to the sound, that they were to pass port to port. The proof leaves no doubt that the Carisco sounded her one-whistle signal to effect such passing and also that she directed her course to starboard as the rules required. There is doubt as to whether the Poling sounded any signals, but there is no doubt that she did not direct her course to starboard. On the contrary, she held her course in the mistaken belief that she was a privileged vessel.

From the foregoing it appears that the collision was caused by the improper maneuvering of the Poling. Her heading was more likely for the south light on Mill Rock than for the north light, and her course brought her too close to the Astoria side of the river.

Decrees may be entered sustaining the libel of the Carisco and dismissing the cross-libel of the Poling.