### GULF OIL CORPORATION v. PALMER et al.

### THE SUSQUEHANNA.

### THE TRANSFER NO. 12.

### THE JAMES P. McALLISTER.

No. 17820.

District Court, E. D. New York.

Aug. 27, 1947.

Foley & Martin, of New York City (Christopher Heckman and Louis J. Lawrence, both of New York City, of counsel), for libelant.

Edward R. Brumley, of New York City (Robert M. Peet, of New York City, of counsel), for respondents.

Purdy & Lamb, of New York City (Edmund F. Lamb, of New York City, of counsel), for respondent-impleaded.

KENNEDY, District Judge.

This libel, promoted by the owners of the barge Susquehanna (Gulf Oil Corporation) is in personam against Howard S. Palmer, James Lee Loomis and Henry B. Sawyer, as trustees of the New York, New Haven and Hartford Railroad Company, the owners of the tug Transfer No. 12. Respondents impleaded in rem the steamtug James P. McAllister. The cause is one of collision.

The collision which gave rise to the litigation took place on the morning of December 17, 1945, at 5:10, somewhere in the vicinity of buoy No. 26, a starboard hand (red) channel buoy on the westerly limit of the Red Hook Flats anchorage ground. The buoy is equipped with a flashing red light and bell.

At about 4:50 a. m. on December 17, 1945, the tug Transfer No. 12[1] left the float bridges at Bay Ridge bound for the Penn-

---

[1] Transfer No. 12 is a steamtug 110 feet long, 26 feet wide. She develops 750 horsepower.

sylvania Railroad float bridges at Greenville, New Jersey. Transfer No. 12 had on her port side the carfloat New Haven No. 65[2], and on her starboard side the carfloat New Haven No. 52[3]. Each carfloat had three tracks, filled with freight cars. Transfer No. 12 was secured to each float by a stern line, head line, and strap, and the bows of the floats were made fast together by a cross line so that the tow formed a "V". I have said that buoy No. 26 is on the westerly edge of an anchorage ground. Actually it is at the southwesterly corner of that area, and just to the southward of it there is a "cross-over", supposedly for the use of cross-traffic. On the morning in question, Transfer No. 12 did not use this cross-over because at that time it was congested. From the Bay Ridge float bridges, her point of departure, she shaped a course for a buoy equipped with a flashing green light, which is at the westerly edge of the Bay Ridge Channel. Transfer No. 12 continued slightly to the northward of that buoy and then rounded to on a course almost northwesterly toward buoy No. 26, thus crossing the Red Hook anchorage itself. In the latter place there were at that time a number of ships at anchor, most of them undoubtedly light. Transfer No. 12 was then making about 4½ knots over the ground. The tide was at the end of flood, and in the Main Ship Channel, for which Transfer No. 12 was headed, the current was northerly at a force of 1.76 knots. The wind was from west at a velocity ranging between 22 miles and 27 miles per hour.

Meanwhile, the steamtug James P. McAllister[4] had proceeded out of the Kills with her tow, libelant's oil barge Susquehanna[5]. On leaving the Kills, James P. McAllister headed (easterly) for buoy No. 24, crossed the entire width of the Ship Channel, and turned on left rudder with the buoy on her starboard hand. She then headed in a general northerly direction, be-

ing about 1,000 feet westerly of the Bay Ridge (easterly) side of the Ship Channel. At this time and until the time of the collision, James P. McAllister was making good about 4½ miles per hour over the ground.

██ From the description I have given, it can be seen at once that Transfer No. 12 had a privilege over James P. McAllister, unless the situation was one of special circumstances. Such, at any rate, was the opinion of the master of Transfer No. 12 who, sighting the James P. McAllister and her tow broad on his own port bow and distant about 1,000 yards, blew one blast. This signal was given just as Transfer No. 12 cleared the bow of a ship anchored to the eastward of buoy No. 26. This blast, says Transfer No. 12, was not answered. Shortly afterward, and when the distance between the ships had closed to about 1,000 feet, Transfer No. 12 blew a second blast, which James P. McAllister answered with a single blast. The latter then attempted on right rudder to pass under the stern of Transfer No. 12, but, seeing very soon that the maneuver could not succeed, the pilot of James P. McAllister thereupon blew an alarm and backed full. Transfer No. 12, which up to that point had been holding her course and speed, turned as sharply as she could on left rudder toward the danger. Nevertheless, the bow of Susquehanna, which it will be remembered was on James P. McAllister's port side, collided with the port side of New Haven No. 65 (Transfer No. 12's port hand tow) at a point about 20 feet from the stern of the carfloat.

There is little necessity to discuss the charges against James P. McAllister. Everything in the case points to the fact that she was guilty of lax lookout, and that her lapse in this regard was a proximate cause of the disaster. Indeed, her own pilot admits that he did not see the Transfer No. 12 and her tow until the latter was about 1,000 feet away from him on his

---

[2] The dimensions of this float are as follows: she is 365 feet long, and 40 feet wide.

[3] New Haven No. 52 is 327 feet long, and 40 feet wide. On the morning in question, her freeboard was 2½ feet.

[4] The James P. McAllister is 98 feet

long, 24 feet wide, and develops 600 horsepower.

[5] The Susquehanna is 241 feet long and 41.6 feet wide. At the time here in question, she had a freeboard of about 3½ feet. Her bow extended 150 feet beyond that of James P. McAllister.

932

starboard hand, and that he had no lookout as such. Had a hand been stationed in the bow of Susquehanna, there is hardly any question that the collision could have been avoided, even though James P. McAllister's pilot himself was not as alert as he should have been. This is not to intimate that I think the alertness of the pilot can often excuse the absence of a lookout. In fact, I believe that there is an unfortunate tendency on the part of tug masters plying New York Harbor to believe that any tug pilot is alert enough to handle his own job and that of lookout too. The decided cases on the subject merely follow the dictates of common sense when they say that the job of informing the pilot of hazards to navigation is one that calls for the undivided attention of a trained hand. The James P. McAllister is clearly at fault.

■ The problem of fault, so far as Transfer No. 12 is concerned, hinges upon the fact that just prior to the collision she was crossing an anchorage ground. Concededly, just before she passed and cleared an anchored ship on her port hand, and blew her whistle, for a port to port passage, she blew no slip whistle. James P. McAllister calls this a fault, citing Canadian Aviator v. United States, 2 Cir., 1946, 154 F.2d 825. Transfer No. 12 says it was not, relying upon Commonwealth & Dominion Line v. United States, 2 Cir., 1927, 20 F.2d 729. Certainly there is no statutory rule, at least any that I have been able to discover, governing the conduct of ships traversing anchorage grounds. It seems to me, therefore, that whether or not failure to sound a slip whistle is a fault, depends upon the peculiar circumstances of the case to be decided, and notably whether the conditions are or are not similar to those in which a ship finds herself, when she leaves a slip, with her view completely obstructed. Certainly, by hypothesis, when Transfer No 12 blew her first one-blast signal to James P. McAllister, the view of the former was not obstructed, and by the same token the view of the latter could not have been. True enough, had Transfer No. 12 sounded a prolonged blast just prior to the one-blast passing signal, James P. McAllister might have realized her burden sooner than she did. But a ship is supposed to look as well as to listen, and it seems quite illogical to temper the consequences to her of her bad lookout on the supposition that her hearing might be better than her eyesight. To put it another way, the position of Transfer No. 12, as I find it to be, was more nearly analogous to that of a vessel which has fully cleared a slip and sounded a crossing signal, rather than that of a vessel completely enclosed in a slip approaching a blind corner. It was not a fault that she blew no slip whistle.

■ James P. McAllister makes further criticism of Transfer No. 12's conduct, saying that she held her course and speed too long. I suppose this is the dilemma which confronts the pilot of every privileged ship when a burdened vessel is reasonably close aboard. He is likely to be damned, whatever he does. But certainly he is not expected to handle both vessels, that is, to forecast the results not only of his own navigation, but also that of a pilot who has acquiesced in the bargain sealed by the exchange of signals. Presumably, James P. McAllister was content with the situation until she blew an alarm. At that instant the pilot of Transfer No. 12 took emergency action, which indeed came very close to succeeding. Had he acted sooner, in all likelihood, he would have hulled James P. McAllister, and his owners would have become liable almost automatically. Personally I think the maneuvers of Transfer No. 12 were unexceptionable.

■ James P. McAllister also complains that although Transfer No. 12 had a lookout, the latter was not stationed on the bows of the carfloats. But clearly, Transfer No. 12 sighted James P. McAllister when the latter was half mile away, and even had a lookout on the bows of the carfloats seen James P. McAllister slightly before his pilot did, the result would not have been changed. For James P. McAllister continued on her course even after Transfer No. 12 blew a blast.

■ The charge that Transfer No. 12 violated the general precautionary rule (Article 27, 33 U.S.C.A. § 212) needs little analysis. Very often, it seems to me, the general precautionary rule lends itself to the type of pleading often found in com-

mon-law indictments—a type of pleading which a great lawyer once characterized as "paper and packthread". Here, from the time when Transfer No. 12 blew her first blast, the situation and the obligations of the respective vessels was clear. And James P. McAllister affirmatively acknowledged that she knew her duty and would carry it out. From there on, Transfer No. 12 was bound to hold her course and speed, at least until it was reasonably clear that she was in the jaws of collision. And until that emergency arose, the general precautionary rule did not supersede the specific obligations upon both vessels.

Libelant is entitled to an interlocutory decree with costs in the usual form, holding the tug James P. McAllister responsible for the consequences of the collision. Respondents Palmer, Loomis and Sawyer are entitled to decree of dismissal on the merits with costs.