## AMERICAN PETROLEUM CO. v. TEXAS CO.

## TEXAS CO. v. AMERICAN PETROLEUM CO.

Circuit Court of Appeals, Second Circuit.
November 1, 1927.

No. 28.

**1. Collision ⟨⟩86—Rule relating to steamers about to enter channel at same time applies to every case where vessels approach one another in narrow channel.**

Rule 3 of Pilot Rules for Rivers Whose Waters Flow into Gulf of Mexico and through Tributaries, relating to steamers about to enter a narrow channel at same time, applies to every case where vessels are approaching one another in a narrow channel.

**2. Collision ⟨⟩103—Failure of ascending tug and barge to stop in wide part of canal, when steamship was descending canal, held fault in navigation.**

Failure of ascending tug and barge to stop in wider part of canal until steamship descending canal had passed *held* violation of rule 3 of Pilot Rules for Rivers Whose Waters Flow into Gulf of Mexico and through Tributaries, and was fault in navigation.

**3. Collision ⟨⟩103—Tug steering to port after striking bank on starboard side, when meeting steamship in canal, contributed to collision.**

Where tug, with barge, was ascending canal, and while passing descending steamship brought bow of tug so close to starboard bank that it struck bank, and this, with starboard wheel, caused sheer of bow to port, and, in attempting to break sheer, stern of barge was thrown to port and nearer to steamship, tug contributed to accident.

**4. Collision ⟨⟩95(1)—Barge under complete control of tug held not responsible for collision.**

Barge under complete control of tug *held* not responsible for collision with steamship in canal.

**5. Collision ⟨⟩103—Steamship, descending canal, which had stopped engines, held in fault for swinging athwart stream, contributing to collision with tug and barge ascending canal.**

Under rule 3 of Pilot Rules for Rivers Whose Waters Flow into Gulf of Mexico and through Tributaries, providing that pilot of descending steamer shall cause his steamer to be worked slowly until he has passed ascending steamer, where steamship descending canal, on seeing ascending barge and tug approaching, had stopped her engines and permitted her stern to be caught by tide and swung out in canal toward barge, steamship was in fault for swing, which contributed to collision, and did not justify.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the American Petroleum Company against the steam tug South American, the barge Tampico, and the Texas Com-

pany, with cross-libel by the Texas Company, owner of the barge Tampico, against the steamship Rotterdam. Interlocutory decree for libelant American Petroleum Company against the steam tug South American and the barge Tampico for one-half of its damages, and likewise interlocutory decree for the Texas Company for one-half of its damages. The American Petroleum Company appeals. Affirmed.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (W. H. Mc-Grann and J. Harvey Turnure, both of New York City, of counsel), for appellant American Petroleum Co.

Barry, Wainwright, Thacher & Symmers, of New York City (John C. Prizer and Paul L. Clugston, both of New York City, of counsel), for appellee.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge. The suits arose out of the collision between the Rotterdam and the Tampico, which occurred at about 4 o'clock on the afternoon of June 30, 1921, in the Sabine-Neches Canal, at a point opposite the upper part of the city of Port Arthur, above the bridge known as the "Pleasure Bridge." The trial court found that the place of collision was at a point about a mile and a half north of the Pleasure Pier bridge, which was a drawbridge across the canal.

The steamship Rotterdam is a bulk tank steamer, 360 feet long, 46.7 feet in beam, which at the time of the collision was drawing 22.6 feet forward and 24 feet aft. The Rotterdam was bound down the canal, partly loaded, and there was a tide setting in the direction in which the Rotterdam was proceeding with a force of about 2 miles per hour. The barge Tampico, which is 248 feet long, 40.1 feet in beam, and with a maximum draft of 19 feet aft, was bound up the canal, in tow of the tug South American, which is 97.6 feet long, 23.6 feet in beam, and with a draft of about 13 feet. The South American was made fast on the starboard quarter of the Tampico, alongside the latter, and was in a position in which the Tampico extended considerably forward of the stem of the tug, and the stern of the tug extended to the rear of the Tampico. Thus the barge, as the vessels met, would pass between the Rotterdam and the tug.

The Sabine-Neches Canal is a dredged channel of several miles in length and connecting Neches river with the Port Arthur ship canal.

The District Court found upon sufficient evidence that there was a wider section of the canal just below the bridge than above it, in the portion of the canal where the collision occurred. The bridge was a single-leaf bascule lift bridge. The collision occurred in the portion of the canal opposite the Woodward lot, so called, which was about 9,000 feet above the bridge. About 1,700 feet below the bridge was a slight bend in the canal, and when the tug and barge were approaching this curve the tug blew for the bridge to open. The bridge subsequently lifted, and not until the barge was entering the draw did the master of the tug or of the barge Tampico see the Rotterdam. Nor did any one on the Rotterdam descry the tug and barge until about the same time.

The opinion of the trial judge says: "The man on the bridge of the steamer had no difficulty in observing the barge at some distance below the bridge." If by this was meant a finding that the Rotterdam saw the tug and tow some distance below the bridge, we regard it as in conflict with all the evidence, except that of the master of the Rotterdam, who, just after the collision, had signed a report (Kaper Exhibit No. 5) in which the following appears: "When we observed the Tampico, she was just passing through the Pleasure Pier bridge to Port Arthur."

It seems, therefore, to have been the fact that none of these vessels saw one another until the tug and barge were about entering the draw. There does not, however, appear to be any reason why a large ship like the Rotterdam should not have seen the tug and barge when the latter rounded the curve about 2,000 feet below the bridge, nor why the tug, had she maintained a proper lookout on the stem of the barge, should not have seen the Rotterdam coming down the canal. It was stated by the master of the tug that there were obstructions, but he apparently admitted that "ordinarily you can see," and the claim made by Kaper, the pilot of the Rotterdam, that he could not see the Tampico and her tug because he did not have any background seems difficult to understand, and is contradicted by the statement of the master, made at the trial (erroneous though it apparently was in fact), that he did see the tug and barge far below the bridge.

We therefore think that each vessel, had it maintained a careful lookout, was in position to see the other at or shortly after the

time the tug and her barge blew to open the bridge, and while the latter was in the wider portion of the canal, which extended for some distance between the bend where the tug blew her signal and the drawbridge itself. In other words, for some distance below the bridge the tug and barge should have become aware of the approach of a large vessel, which they would have to pass in a channel exceedingly narrow at best, and should have accordingly stopped in this portion of the channel where it was widest until the descending steamer could pass through it. On the other hand, the descending steamer was in a position where she should have seen the tug and barge coming nearer and nearer to the bridge, and getting beyond the portion of the channel which was the widest and most available for the vessels to pass.

The tug, after passing through the bridge, blew a signal of one blast which was answered by one blast by the Rotterdam, indicating an acquiescence in a port to port passing; while at some distance from the Rotterdam the tug put her course to starboard and proceeded to the right-hand side of the canal and along the sloping bank. When the bow of the Tampico was somewhere near abreast of the bow of the Rotterdam, the barge took a slight sheer towards the steamer, that was at least partially overcome by the tug, which reversed her engines for a short space of time. When about half the length of the barge had passed the stern of the steamer, the steamer's port quarter came into collision with the port side of the Tampico about abreast of the latter's mainmast, and between 20 and 50 feet from the stern of the Rotterdam.

The master of the Rotterdam testified that, when they saw the Tampico, "We thought we might stop and stay on the mud and let her pass us, but the tide was too strong and throwed our stern over. Q. Toward the Tampico? A. Toward the Tampico, yes; we were on the mud, and thought she could pass us, and we tried to get just as fast in the mud as we could, and stopped the engines. Q. Your bow in the mud? A. The whole ship in the mud, but the tide was too strong and pushed the stern off; we were lying across the river, so we had to move her ahead again and keep on the bank, the only way to get clear."

In addition to this testimony, Gomes, the chief engineer of the Rotterdam, testified that her engines were stopped one minute before the collision; that the ship was on the bank and had hardly any speed. ·

Under such circumstances, we think it almost inevitable that the stern of the Rotterdam was carried out into the center of the stream by the current, and this is borne out by the fact that she collided with the Tampico somewhere near amidships of the latter. There is no doubt that the tug was close to the starboard side of the canal, and if the collision was wholly due to the sheer of the Tampico, the attempt to break which swung her stern toward the Rotterdam, the stern of the Tampico, and not a point almost amidships of the latter, would have been the point of contact with the port quarter of the Rotterdam.

[1, 2] Rule 3 of the Pilot Rules for Rivers Whose Waters Flow into the Gulf of Mexico and through Tributaries, which applies in general to the canal in question, reads as follows:

"When two steamers are about to enter a narrow channel at the same time, the ascending steamer shall be stopped below such channel until the descending steamer shall have passed through it; but should two steamers unavoidably meet in such channel, then it shall be the duty of the pilot of the ascending steamer to make the proper signals, and when answered, the ascending steamer shall lie as close as possible to the side of the channel the exchange of signals may have determined, as provided by rule 1, and either stop the engines or move them so as only to give the boat steerageway, and the pilot of the descending steamer shall cause his steamer to be worked slowly until he has passed the ascending steamer."

While the foregoing rule in terms speaks of entrance into a narrow channel, and the vessels were in a narrow channel at all times, yet it can hardly be construed so narrowly as to defeat its purpose, and must be regarded as applying to every case where vessels are approaching one another in a narrow channel. The tug and barge should have stopped below the bridge, and have kept in the wider part of the canal when the passing vessels had a width of 108 feet 4 inches, and the canal was so narrow. Even a few additional feet afforded a better chance to avoid a collision. The failure to do this was a violation of the rule, and the District Judge properly found it a fault in navigation. The trial judge also held the Rotterdam in fault for not seeing the Tampico when below the bridge and blowing alarms. This is more doubtful. The Rotterdam had the right of way, and the danger was, or should have been, equally obvious to the tug and barge.

It has been held that the failure to blow an alarm in such a case is not a fault. The Queen City (D. C.) 189 F. 653; The Osceola (D. C.) 50 F. 326. After the tug and barge had violated the rule by not stopping below the bridge, and when above it had given a one-blast signal to pass port to port, the Rotterdam could do nothing but acquiesce, and for that matter neither vessel could then safely go back.

[3] Thus the tug committed initial faults that contributed to the collision, by not maintaining an effective lookout, and by not stopping in the passing basin below the bridge, where the channel was wider than above, and waiting for the Rotterdam to go by. But after the tug and barge gave the signal of one blast, which was answered by the Rotterdam, and all three vessels proposed to pass in the narrow channel above the bridge, rule 3 still applied. The Rotterdam had the right of way, and the tug was obliged either to stop her engines or move them so as only to allow proper steerageway. The tug seems to have so navigated that, while passing the Rotterdam, she brought the bow of the Tampico so close to the starboard bank that it struck the bank. This, together with a starboard wheel which the Tampico had been holding under direction of the tug master in order "to give steerage for the tug to handle the barge," caused a sheer of the bow of the Tampico to port. It doubtless was not a great sheer, and was estimated at only from 5 to 15 feet, but every foot was important in that narrow channel. The tug master backed to break the sheer, and this undoubtedly resulted in throwing the stern of the barge to port and nearer to the Rotterdam. We think, as the trial court found, that this sheer contributed to the accident, and could have been avoided if the tug had navigated more carefully, and had not by some unexplained action brought the bow of her barge against the bank of the canal at the very time the Rotterdam and Tampico were passing.

[4, 5] The Tampico was under the complete control of the tug, and therefore was in no way responsible for the collision. The Rotterdam was dragging in the mud and entirely or substantially stopped at the time of the collision. Rule 3 provides that "the pilot of the descending steamer shall cause his steamer to be worked slowly until he has passed the ascending steamer." As a matter of fact, the Rotterdam had been scarcely moving for some time before the collision, and for a whole minute prior her engines were completely stopped. We think it evident, both from the testimony and from the place on the Tampico where the collision first occurred, that the Rotterdam must have permitted her stern to be caught by the tide and swung out into the canal toward the Tampico. This was because she had so little headway, and finally, by completely stopping her engines, had lost all control. If she had either worked her engines at all times, or had directed the assisting tug which followed her to hold back and steady her on a stern line, we think her swing athwart-stream would have been averted. We find her in fault for this swing, which contributed to the collision, and the Rotterdam has not justified.

The interlocutory decree is affirmed.