## THE JAMES A. McKENNA.

## THE NO. 12.

Circuit Court of Appeals, Second Circuit. April 9, 1928.

No. 147.

1. Collision ⬤95(7)—Tug held at fault in part for collision for trying to round to in narrow waters in path of Transfer.

Tug *held* at fault in part for collision between barge and float of Transfer, where tug tried to round to in narrow waters in path of Transfer.

2. Collision ⬤11—Sailing rules are inapplicable to colliding vessels, which were not on steady course, but maneuvering.

Where neither of colliding vessels was on steady course, but each was maneuvering, sailing rules do not apply.

3. Collision ⬤95(7)—Transfer held at fault in part for collision in failing to sooner stop and reverse, though she knew tug was leaving pier.

Transfer *held* at fault in part for collision between its float and barge of tug, in that Transfer failed to stop and reverse sooner, although she knew that tug was coming out from pier side.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the Pennsylvania Railroad Company against the tug James A. McKenna and the Transfer No. 12. From a decree holding both respondents at fault, the tug James A. McKenna appeals. Affirmed.

Appeal from a decree in the admiralty of the District Court for the Southern District of New York holding the tug McKenna and the Transfer No. 12 both at fault for a collision.

At 3 p. m. on March 8, 1922, the tug McKenna was lying bows in on the north side of the long pier at Greenville, N. J. The day was fair, the tide ebb, and there was a strong breeze of between 40 and 50 miles an hour blowing out of the northwest and about parallel with the pier. North of the Greenville pier, which makes out some 2,000 feet from the bulkhead, are the float bridges of the Pennsylvania terminal, and north of the float bridges a breakwater extends out in the harbor about 3,000 feet, at a slight angle to the pier. Though the breakwater starts a little further inshore than the pier, it projects out into the harbor some 750 feet further, and the two form a kind of slip about 750 feet wide at the pier end. The four float bridges at the bulkhead occupy the southern half of this slip; their northernmost rack extending out 600 feet.

The McKenna had made up a tow, consisting of two Pennsylvania barges abreast on two 15-fathom hawsers from the McKenna's stern, and a derrick scow made fast astern of these. Being ready to get under way, the McKenna started forward under a port helm to round to in the slip and pass out into the harbor with her tow. Meanwhile the Transfer No. 12 was coming in with a car float on either hand, bound for the float bridges. She was headed for the rack between the two northern bridges, and was about in line with the northern and longer rack. The Transfer blew her arrival signal to the bridges, got a response and came in slowly against the wind.

Before the McKenna had actually left the pier side, an exchange of single blasts took place between the vessels, the initiation of which is disputed. The McKenna came on under a hardaport helm, rounded to across the bows of the Transfer, and safely passed her port to port, as she had intended to do.

However, her swing was not made soon enough to carry her barges clear, for the Transfer, though she reversed and blew alarms, had not killed all her way, and her port float collided with the port barge of the McKenna, doing the damage complained of.

The judge held that the McKenna was at fault for trying to found to in such narrow waters in the path of the Transfer, and the Transfer for failing sooner to stop and reverse, though she knew that the McKenna was coming out. The McKenna alone appealed.

Alexander & Ash, of New York City (Edward Ash, of New York City, of counsel), for the McKenna.

Haight, Smith, Griffin & Deming, of New York City (Henry M. Hewitt and James McKown, Jr., both of New York City, of counsel), for the Transfer.

Burlingham, Veeder, Masten & Fearey, of New York City (Norman M. Barron, of New York City, of counsel), for libelant.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge (after stating the facts as above). [1, 2] Of the McKenna's fault there seems to us no possible doubt. She had not yet left the pier side when she first saw the Transfer, and of course her tow had not either. Nothing prevented her from stopping where she was. She had the wind in her face and the tide would carry her back to the pier; she could have lain where she was. On the other hand, it was plainly dangerous for her to try a turn which, as the event proved, she could not make. Her defense is that the Transfer should have ported and given her more room, apparently on the notion that this was a passing case, though it was not, but one of special circumstances. Neither vessel was on a steady course, each was maneuvering, and the sailing rules did not apply. The Jamison, 241 F. 950 (C. C. A. 2), The Transfer No. 17, 254 F. 673 (C. C. A. 2). Indeed the rules would be only a source of confusion and disaster if applied to cases like this, for they are based upon the assumption that the future positions of each vessel may be forecast by the other. This means that the courses are fixed. In this case, for example, it was impossible for the Transfer to know whether the McKenna would lie at the pier, would pass under her stern, as indeed she should have done, or would try a port to port passing. True, she must have known that the tow was intending to come out, but it was altogether uncertain just how or when she would do it, and the exchange of whistles really told nothing to either party, however each may in fact have read them. If, then, the McKenna expected more room in which to make her turn, she had no warrant for her assumption, and it was a grave fault to attempt what she did.

[3] The Transfer's fault was that she did not keep a sharp lookout on the McKenna after the exchange of signals. Her master and mate admit that they did not look at her after that time, until she was half way around, when it was too late. This must have taken a substantial time, during which both men concede that their attention was directed elsewhere. The exchange of whistles did not necessarily mean that the McKenna would not move, but rather, if anything, that she was about to do so. A sharp lookout would have disclosed the McKenna emerging from the pier some time before she had swung half way round, and prompt action would probably have prevented the collision. While we think the faults of the two vessels were unequal, we cannot altogether absolve the Transfer, whose failure in vigilance contributed to the result.

Decree affirmed.