## THE CLAREMONT. *

### REISS STEAMSHIP CO. v. THE CLAREMONT.

### No. 1915.

District Court, W. D. New York.

March 27, 1935.

Duncan, Leckie, McCreary, Schlitz & Hinslea, of Cleveland, Ohio (Thomas H. Garry and Gilbert R. Johnson, both of Cleveland, Ohio, and William M. Connelly, of Buffalo, N. Y., of counsel), for libelant.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for respondent.

RIPPEY, District Judge.

This action is brought to recover $13,-624.79 damages claimed to have been sustained by the steamer John F. Reiss on May 15, 1933, when her bilge on the starboard side struck against the west bank of the Black Rock Ship Canal, while the steamer was passing the tug Claremont and tow.

Shortly after 5 o'clock p. m. on the afternoon of May 15, 1933, the steamer Reiss was proceeding unloaded, southerly in the Black Rock Ship Canal on her trip from Tonawanda, N. Y. to Ashtabula, Ohio. When near the Peace Bridge, the captain noticed a tug towing canal barges coming around a curve about a half mile ahead and going in a northerly direction. He stopped her engines, so that the vessels would not meet on the curve, and promptly gave a one-blast passing signal, which was promptly answered by the respondent. When the captain of the Reiss decided that the tug was out of the curve and in the straight stretch where the vessels could pass safely, he again started his engines slowly to give him steerage, and directed his ship to starboard and pointed her course to Bird Island Light. When the tug came in sight of the Reiss around the curve, both vessels were proceeding along the center of the canal. The tug Claremont was towing four barges loaded with grain, and was on a voyage from Buffalo to New York. The Reiss was 523 feet long over all, with a beam of 54 feet. The Claremont was 59 feet long and 22 feet beam. The barges were two abreast, and two abreast astern of the first two, lashed closely together. The tow was attached to the tug by means of a bridle hawser, one line leading to the outside front corner of the port barge and one leading to the outside front corner of the starboard barge. The distance between the tug and

*Decree affirmed 80 F.(2d) 1017.

the barges was 40 feet. Each barge was approximately 108 feet long over all; the hawser team of barges were 28 and 31 feet wide respectively and the rear team were 28 and 29 feet wide, so that the entire length of the Claremont and her tow over all was approximately 340 feet and its width 60 feet. The tow was drawing 9.6 feet of water. The Reiss was drawing about 15 feet of water aft, and about 7 feet forward, at the time of the accident.

The channel is a rock groove 200 feet wide at the bottom and 21 feet deep. On the west edge, the rock extends up to about 12 feet below the surface of the water, and to the west of the channel is open water. The west side of the rock channel is not perpendicular to its bottom, but slopes backward to a distance of 10 or 15 feet from the perpendicular. Rocks and other obstacles collect from time to time on this slope, and navigation is not supposed to pass over it. The 200-foot channel was free of obstruction, and the channel itself was suitably marked by buoys, so that vessels might ascertain the limits within which the channel might be safely navigated.

The master and crew of the Reiss were experienced and trustworthy; the crew was sufficient for the navigation of the vessel at the time of the accident and the ship was in all respects seaworthy; and the captains of both the Reiss and the Claremont were familiar with the canal and navigation thereof.

Immediately upon entering into the passing agreement, the Reiss pulled over to her starboard, out of the center of the stream, but the Claremont continued her original course without giving way. The captain of the Claremont testified he pulled to starboard, but his testimony is contradictory on important points, and the overwhelming weight of the evidence is to the contrary. When the vessels were about 600 feet apart, the captain of the Reiss shouted a warning through a megaphone to the captain of the tug, but the tug did not change its course. The captain of the tug and others on the tug and barges testified they heard no warning, but the positive testimony of the officers of the Reiss must control. To avoid a collision, the Reiss continued to starboard and was, at the time of passing, approximately to the west edge of the canal channel. While the vessels were passing, there was about 10 feet of water between the Reiss and the tow. When the stern of the Reiss was abreast

of the tow, the captain changed her course slightly to pull her out toward the center of the stream; her stern swung slightly to starboard. Her starboard bilge struck on the rock side of the canal. The Reiss was then moving 2 to 3 miles per hour, the tug 4 to 5 miles per hour, and there was no current or wind.

There is no doubt as to the location of the Reiss at the time she and the tug met. She had swung to the west of the center of the canal. No one could see the west bank of the canal as it was submerged, but the captain, mate, wheelsman, and watchman all testified they felt a jar when the boat struck. They were the ones concerned in the safe navigation of the boat, and what happened at the time should be found on their testimony, especially as their credit was not successfully assailed. The fact was entered in the log, and the captain immediately reported the incident to his employers. The following day a survey of the ship was made at Ashtabula and it was found that the plates were dented in and that there were leaks in the rivets and butt strap seams. Shortly after the survey was made, Captain Lawrence of the Reiss reported to the United States local steamboat inspectors at Buffalo that the vessel had struck bottom.

There is no evidence whatever contrary to the testimony of the captain of the Reiss and members of her crew on this point. The pilot house log entry reads as follows: "5–15, 5:30 P. M. Black Rock Canal rubbed bottom with our bilge on starboard side forward of boiler house about 1000 feet north of Bird Island light, being crowded over on west side of channel by tug Claremont and four canal boats * * *."

A similar entry was made by the chief engineer in his log.

The evidence is undisputed that passing signals were exchanged between the tug and the steamer, and the answer of the respondent admits it.

Starting with the fact as found, that the Reiss was on the west side of the canal channel at the time the steamer and the tug met, the testimony of the captain and crew of the tug as to the space separating the boats corroborates the testimony of the captain and crew of the steamer that the tug did not give way, and did not obey the passing agreement, and crowded the Reiss to the west bank of the canal. It will be recalled that the beam of the

Reiss was 54 feet, and that there was about 25 feet of open water between the tug and the steamer when they met. The tow extended farther to the west. Thus the port side of the tug and tow was not farther away from the west side of the channel at the time of passing than approximately 79 feet. It is thereby established out of the mouths of witnesses of the respondent that the tug was proceeding approximately up the center of the canal at the time of passing, as claimed by libelant, and that a substantial part of the tug and tow was to the west of the center of the canal.

There can be no doubt that the weight of evidence establishes that the Reiss was injured by striking the west bank of the canal after she had been put in a position to strike through the negligence of the tug in failing to obey the passing agreement and to give her room to pass and in crowding her out of her course. There were no other vessels in the vicinity to interfere with the navigation of the boats. The Burlington (C. C. A.) 63 F.(2d) 781; United States Mexican Oil Corporation v. Pennsylvania R. Co. (C. C. A.) 20 F.(2d) 385; The Lake Shore (D. C.) 201 F. 449; The Maggie J. Smith, 123 U. S. 349, 8 S. Ct. 159, 31 L. Ed. 175.

■ The evidence is satisfactory that as the Reiss started to pull back into the canal, her officers maneuvered the ship slowly and carefully. Neither can the captain of the Reiss be charged with exercising bad judgment in the manner in which he handled his vessel. When he saw the tug approaching in the center of the canal and not obeying the passing agreement, he was confronted with the possibility of a collision or with striking the bank of the canal. What he attempted to do was to avoid both. He could not reverse his engines; such an act would have thrown his boat across the canal in front of the tug. He exercised good judgment based upon experience, and under such conditions the court will not substitute its judgment, if its judgment were different from that of the master, for his. The Mohegan (C. C. A.) 28 F.(2d) 795.

■ Neither was it the fault of the Reiss not to sound a danger signal when the captain observed that the tug was not obeying the passing agreement. The evidence establishes that the captain of the tug was fully alive to the situation, saw what was going on, and was bound to know and an-ticipate any damages resulting from his continuing on the course that he did. The conduct of each vessel was obvious to the other, and the blowing of an alarm, rather than the giving of the warning by the megaphone, or giving no warning at all, would not have changed the situation. American Petroleum Co. v. Texas Co. (C. C. A.) 22 F.(2d) 290, 293.

■ From the above facts as found, it must be held that the Claremont was guilty of negligence, causing damage to the Reiss, and that the Reiss was free from fault and should be exonerated.

A decree may be entered in accordance with this opinion and upon the facts stated and found, and may provide for the appointment of a commissioner to take proof upon and assess damages.