**PORT LINE, Limited, v. UNITED STATES.**

**UNITED STATES v. PORT LINE, Limited.**

No. 186, Docket 21589.

United States Court of Appeals
Second Circuit.

Argued March 6, 1950.

Decided April 10, 1950.

Irving H. Saypol, U. S. Atty., New York City, Max Taylor, New York City, for appellant.

Reid, Cunningham & Freehill, New York City, Herbert P. Reid, New York City, for appellee.

Before L. HAND, Chief Judge, and SWAN and FRANK, Circuit Judges.

L. HAND, Chief Judge.

The United States appeals from a decree in the admiralty, holding solely liable its

tanker, Julesburg, for a collision between her and the ship, Port Adelaide, owned by the Port Line, Ld. The collision took place on the afternoon of February 1, 1944, in New York harbor about 1000 feet below the Quarantine Station dock, and near the shore. The Port Line, Ld., filed a libel against the United States under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., on February 5, 1944; the United States answered on June 12, 1946, and on the same day filed its cross libel, which the Port Line, Ld., in turn answered on June 20, 1946. The suits were consolidated and came on for trial on April 7, 1949; and the judge dismissed the libel of the United States and entered an interlocutory decree in favor of the Port Line on May 3, 1949. The facts were substantially undisputed, and were in substance as follows. The weather was clear though overcast and the visibility was good; the tide was at the strength of the flood and the wind was at gale force out of the northwest. It was war time and the anchorage off Stapleton was crowded with vessels, those closest to the shore forming a line running in the general north and south direction, about 1500 feet from the Staten Island shore, and making a kind of "fairway" through the anchorage. The Port Adelaide, which had been one of the ships in the line, weighed anchor at about 1:15 in the afternoon; and, though she was bound up stream, turned to the left as she emerged, meaning to go south for a distance through the "fairway," then to turn left between some ships further down the line, and so to reach the usual channel, through which she was to pass to her berth in the North River. Owing to the combined action of tide and wind, she was unable to turn parallel to the axis of the "fairway" before she found herself too close to the shore, although she had come some distance to the south and presumably had changed her heading somewhat to port. She backed again inside the line of ships at a point some distance below her original station, to a position where, as appears from her engine log, she arrived at about 1:30 P.M. Almost at once she went forward, again under a left rudder, and again she

got too close to the shore without completing her turn. She was therefore forced to back a second time into the line, reaching at about 1:38 a position still further to the south, and heading a little further to port. For a third time she started forward at 1:50, but again she failed, as her pilot must have anticipated; for he testified that he did not expect to be able to make a complete turn before he had tried seven or eight times.

The Julesburg had also been in the line of ships which formed the eastern border of the "fairway," about a mile to the north of the original position of the Port Adelaide. She weighed anchor at 1:18, and she too had difficulty in making her turn to the south. Her pilot testified: "We tried three or four, or maybe half a dozen different maneuvers trying to get it around one way or another. * * * We had to wait for the tug to push us around." A tug did arrive at 1:26, but even with her aid, it was apparently not until 1:42 that she turned enough to go down the "fairway." Her engine movements from 1:44 were either full ahead, half ahead, or slow ahead until 1:55, when she stopped. A minute later she went full speed astern and let go her port anchor, and the collision was at 1:57. The judge found that her speed was between six and seven knots and it follows that at 1:51, when we assume that at the latest The Port Adelaide began to be visible, until 1:56, when The Julesburg began to back, she travelled in the neighborhood of 3000 to 3500 feet, a little over a half a knot. The United States does not upon this appeal seek to excuse The Julesburg, so that the only question is whether The Port Adelaide was also at fault.

█ Concededly, the situation was one of "special circumstances," for The Port Adelaide had not got upon a "steady course." Her pilot testified that he did not see The Julesburg until he was about 1000 feet from the shore, which would be after The Port Adelaide had travelled some 500 feet beyond the vessel to the north of him. He further testified that he was uncertain as to what The Julesburg

would do, when he did make her out. She had, he thought three possible courses open to her: she might turn off to her own port and pass between vessels in the line above The Port Adelaide; she might go under his stern; she might back, let go her anchor, as eventually she did. How long the pilot waited before taking any action does not appear; and his first step was to give the order to back and the backing signal. Moreover, this he did, not as part of any action to avoid The Julesburg, but because he was getting too close to the shore, for he did not succeed in stopping his vessel until she was about 500 feet away from it—he said 300 feet. After he had given the backing signal he gave the signal of four blasts required by Rule III of Article 18 of the Inland Rules.[1] That delay was in disregard of this rule and was a statutory fault, for on his own admission he had failed to understand the "course and intention" of The Julesburg, apparently as soon as he saw her.[2] The rule applied to The Port Adelaide, though she was not on a "steady course." It is true that courts have often held that the navigation rules apply only to ships upon "steady courses"; but, so far as we know, the limitation has always been applied to situations in which at least one of the vessels is obliged to change her course or speed.[3] The reason for the limitation is easily understood; a change of course or speed by one vessel obviously will serve to avoid collision only when she can foretell the future positions of the vessel to be avoided: i. e., when she is on a "steady course." Rule III on the other hand assumes that the course of one of the vessels is not manifest to the other; and is in effect only a declaration that the ad-

dressing vessel wishes the addressed vessel to make plain her intention. It would be absurd to limit such a rule to situations where both vessels were on a "steady course"; and equally so when only one was. There is no such limitation in the rule itself, or for that matter in any of the Inland Rules; it has been imported by judicial interpretation and should end with its necessity.

■ Moreover, The Port Adelaide was guilty of the separate fault of keeping a slack lookout, else she would not have got 1000 feet from the shore before anyone on board made out The Julesburg. That fault imposed upon her the same burden of proof as does the breach of a statutory rule;[4] and we cannot say of either of the faults that it could not have contributed to the collision. First, as to the failure to make out The Julesburg earlier. It is true that, had the pilot been advised of The Julesburg's presence at once, it is most unlikely that he would have given the required signal, since he did not do so even after the vessels came to closer quarters. But if he had failed to do so, that would itself have been a fault, and the ship cannot excuse her negligent lookout by suggesting that she would have been guilty of another fault, had she been properly watchful. Had the pilot alerted The Julesburg at once, no one can say that she would not have taken some precautionary measures; or that, if she had not, The Port Adelaide—by hypothesis alive to the risk—would not have taken any on her own part. Second, as to The Port Adelaide's failure to blow the required signal after the pilot did make out The Julesburg. We do not know just when that was; it may have been as much as a minute before the pilot

---

1. § 203, Title 33 U.S.C.A.

2. Henry Du Bois Sons Co. v. A/S Ivarans Rederi, 2 Cir., 116 F.2d 492; James McWilliams Blue Line, Inc. v. Card Towing Line, Inc., 2 Cir., 168 F.2d 720; National Motorship Corporation v. United States, 2 Cir., 171 F.2d 413.

3. The Servia, 149 U.S. 144, 156, 13 S.Ct. 817, 37 L.Ed. 681; The William A. Jamison, 2 Cir., 241 F. 950; The James A. McKenna, 2 Cir., 25 F.2d 639; Great

Lakes Dredge & Dock Co. v. The Santiago, 2 Cir., 155 F.2d 148.

4. The Ariadne, 13 Wall. 475, 479, 20 L.Ed. 542; The Madison, 2 Cir., 250 F. 850; Martin Marine Transportation Co. v. Jakobson & Peterson, 2 Cir., 135 F.2d 325; Gulf Oil Corporation v. The Socony No. 16, 2 Cir., 162 F.2d 869; Rice v. United States, 2 Cir., 168 F.2d 219; Ira S. Bushey & Sons v. United States, 2 Cir., 172 F.2d 447.

sounded four blasts, and that delay might have made the difference between collision and safety.

Nor is it an answer to say that a vessel is justified in assuming that an approaching vessel will do her duty. That is true when the second vessel's future course is plain and when if she continues upon it, the two will pass in safety; the first vessel is not charged with notice that the second will unexpectedly deviate. But the first vessel should not so assume, when, as here, she is not certain of the course of the second. Apparently in the case at bar The Port Adelaide did assume that each of the three courses open to The Julesburg was safe; but that was true only in case The Julesburg acted in season, and there. is no doctrine that one vessel is free to assume that the other will take emergency precautions in season, when these will be necessary if she continues as she appears. to intend.

Decree modified to hold both vessels at fault.