**REISS STEAMSHIP COMPANY,**
Libelant-Appellee,

v.

**COMPAGNIA FLETERA CAJOTAMIL,**
S. A., Claimant-Appellant.

No. 16764.

United States Court of Appeals
Sixth Circuit.

March 16, 1967.

1. V. H. Monette & Company, Incorporated et al. v. Commissioner, 45 T.C. 15.

John D. Kelleher, Cleveland, Ohio, for appellant, McCreary, Hinslea & Ray, Cleveland, Ohio, on the brief, Lee C. Hinslea, Lucian Y. Ray, Cleveland, Ohio, of counsel.

Scott H. Elder, Cleveland, Ohio, for appellee, Robert Branand, Johnson, Branand & Jaeger, Cleveland, Ohio, Thomas C. MacDonald, Jr., Shackelford, Farrior, Stallings, Glos & Evans, Tampa, Fla., Jett, Sykes & Berkley, Norfolk, Va., on the brief.

Before PHILLIPS, EDWARDS and CELEBREZZE, Circuit Judges.

CELEBREZZE, Circuit Judge.

This is an appeal in admiralty from a judgment of the District Court finding the Steamer Elpis (Elpis) solely responsible for the damage caused by the crowding and grounding of the steamer Charles C. West (West) in the channel at Toledo, Ohio. The facts surrounding the grounding of the West are these: At 6:13 p. m., November 20, 1962, the West, owned by the Libelant-Appellee, entered the Toledo channel, inbound for Toledo, Ohio. The West, 572 feet long with a beam of 60 feet, and equipped with twin screw engines, was traveling light with water ballast. Ahead of the West in the channel were the dredges Alaska and Hoffman, and astern was the Steamer Dow Chemical. At the same time the Elpis, owned by the Appellant, laden with cargo, was proceeding outbound to Lake Erie. The Elpis was 511 feet long with a beam of 57 feet, and was equipped with a single screw engine.

The Toledo channel, which is 500 feet wide, runs generally in an east-west direction, inbound vessels traveling west on the north side of the channel, and outbound vessels traveling east on the south side of the channel.

At the time these vessels were in the channel, the wind was 35 to 40 miles per hour out of the south. When the dredge Hoffman was two miles ahead of the West, and the dredge Alaska was three miles ahead of the West, the Hoffman called the West and informed her that it had checked to half speed (six miles per hour) because the Elpis was then passing the Alaska.

When the West was one mile behind the Hoffman, it received a call from the Hoffman which informed the West that the Hoffman had been blown onto the bank. When the Elpis and the West were three-quarters of a mile apart, the West blew a port to port passing signal which was answered by the Elpis. The West then checked to slow. When the two vessels were one-half mile apart, the West called the Elpis on the radio-telephone and told the Elpis she was crowding the West, and asked the Elpis to give her more room. Although the Dow Chemical heard this call, the Elpis denied hearing it and never answered or responded to the call.

As the Elpis passed the grounded Hoffman and approached the West, the Captain of the West recognized a dangerous situation developing in the narrow channel. On direct examination the Captain of the West testified, in part as follows:

"Q. Why did you do that, Captain? A. To give more ·opening gap between me and Elpis and Hoffman so that I can get aground there, I don't get too close to the Hoffman as I went by him.

"Q. Now at the time you checked your engines to slow, where was the Elpis in relation laterally in the channel? A. He was on my side of the channel coming straight down on the red side.

"Q. After that from the time you checked to slow speed until you actually met and passed the Elpis, what alterations of course, if any, did you notice the Elpis make? A. None.

"Q. He came right on the same course? A. Right on the same course.

"Q. And where would you say that course was? A. On my side of the channel, on the red side.

"Q. When you saw this situation developing, Captain, what did you do? A. I called on the phone to give me more room, that you're crowding me out of the channel, to get over to the right, you are crowding me out of the channel.

"Q. What vessel did you call, Captain? A. The Elpis.

"Q. And you told her, told the Elpis what? A. To get over more, you're not giving me no room, you're crowding me out of the channel.

"Q. What then did you do with your engines, Captain? A. That time we were less than half a mile from each other and I stopped.

"Q. You stopped your engines? A. Yes.

"Q. Why did you do that? A. It was just a moment of stop, I stopped——

"Q. I didn't—why did you stop your engines? A. To avoid—to see what is going to happen here, to avoid a collision."

On cross-examination the Captain testified:

"Q. As I get your story or the answer, when you—immediately after, within a few seconds after you heard the Hoffman was against the bank, you realized it was a dangerous situation with reference to the Elpis and the Hoffman, is that right? A. Yes.

"Q. No? A. Yes.

"Q. That is right. Now, what did you do at that time when you realized that there was a dangerous situation ahead? A. When we got within less than half a mile of the Elpis, I stopped the engine.

"Q. All right. So you continued on for some distance knowing there was a dangerous situation before you stopped your engines, is that right? A. Yes.

"Q. And had you blown the one-blast signal? A. Before that, yes.

"Q. So that in the face of a dangerous situation you blew a one-blast passing signal to the Elpis? A. Yes.

"Q. And she answered you with a one-blast? A. Yes.

"Q. And that is all you did? A. Yes. There was only one blast before.

"Q. And then later the situation became more dangerous and you stopped your engines? A. Yes.

"Q. And at that time you were going over the ground about three miles an hour? A. About three."

Because of the narrow channel and the high wind, both vessels approached each other in the center of the channel. There was a direct conflict in the evidence as to the position of the Elpis. Several witnesses placed the Elpis directly in front of the West on the north side of the channel. Other witnesses placed the Elpis in the outbound, south half of the channel. All the witnesses testified the Elpis came straight down the channel without a change of course. Normally, when two vessels are approximately two boat lengths or 1200 feet apart, each vessel will pull to the right and pass. Here when the two vessels were less than a boat length apart, the West turned sharply toward the north bank, and as the stern of the Elpis reached the pilot house of the West, the West made a hard left to swing back into the channel and was grounded.

Several witnesses testified that if the West had dropped her anchor and stopped her engines, she would have been blown ashore. The Captain of the Dow Chemical testified that if the West had dropped anchor, the Dow Chemical either would have collided with the West or would have been blown ashore.

As these dangerous conditions developed, neither the Elpis nor the West blew a danger signal. One independent witness, Captain John Burke, called by the Elpis testified on cross-examination:

"Q. And don't you think it would be good seamanship, Captain, if as your vessels approached within two lengths and you had to switch off and you got a little concerned that this other vessel might not be going to carry out the agreement, do you think it would be good seamanship to contact on the radio-telephone and tell him he is not moving fast enough?

"A. Not at that distance. It is too late for that. I'd say danger signal."

The District Court found that the Elpis was navigating over the center line into the north half of the channel, and that the Elpis came straight down the channel without a change of course. The failure of the Elpis to honor the passing agreement and alter her course upon meeting the West was found to be the sole fault which caused the grounding the West. The Court further found that the West did not violate Great Lakes Navigation Rule 26, 33 U.S.C. Section 291 by its failure to sound a danger signal, or by its failure to drop anchor, stop and reverse her engines.

The only issue presented on appeal is whether the West was contributorily at fault by violating Great Lakes Navigation Rule 26, and Coast Guard Pilot Rule 90.2. The West argues, and the District Court so found, that the West was not required to sound a danger signal because she had a right to rely on the passing agreement and a right to expect that the Elpis would alter her course to starboard at the appropriate time. Further, the District Court found that the danger implicit in the approach of the two vessels should have been equally obvious to the Elpis as well as to the West, and where the conduct of each vessel was obvious to the other, the sounding of an alarm was not required.

The West further argues that had the West dropped anchor and reversed its engines, the West would either have collided with the Elpis, or with the Dow Chemical, or would have been grounded.

The primary source for the standards of correct action are found in the statutory rules of navigation. Great Lakes Navigation Rule 26 requires as follows:

"If the pilot of a steam vessel to which a passing signal is sounded deems it unsafe to accept and assent to said signal, he shall not sound a cross signal; but in that case, and in every case where the pilot of one steamer fails to understand the course or intention of an approaching steamer, whether from signals being given or answered erroneously, or from other causes, the pilot of such steamer so receiving the

first passing signal, or the pilot so in doubt, shall sound several short and rapid blasts of the whistle; and if the vessels shall have approached within half a mile of each other both shall reduce their speed to bare steerageway, and, if necessary, stop and reverse."

■ These navigation rules are strictly and literally construed. Belden v. Chase, 150 U.S. 674, 698, 14 S.Ct. 264, 37 L.Ed. 1218 (1893). In The Pennsylvania, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874) the Supreme Court said:

"The liability for damages is upon the ship or ships whose fault caused the injury. But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute."

In commenting on the force of this case, the authors, in The Law of Admiralty, Gilmore & Black, pages 404 and 405, state:

"Indeed a vessel at fault in connection with a collision usually derives little comfort from the rule that she cannot be held liable unless her fault contributed to the result. This contention is more often than not made futile by the so-called 'Pennsylvania' rule (named after the case in which it was laid down by the Supreme Court) which states a drastic and unusual presumption arising on its being shown that a vessel has been guilty of statutory fault before a collision. Where this appears, the vessel thus cast in fault must prove, to escape liability, not only that the fault shown probably did not but also that it could not have contributed to causing the collision. This rule makes especially important the strictest compliance with the rules of navigation."

In Port Line v. United States, 181 F. 2d 365 (C.A.2, 1950), the Circuit Court modified the Trial Court's finding that the tanker Julesburg was solely at fault by finding the vessel Port Line also at fault because of its failure to sound a danger alarm. On this the Court said:

"Second, as to The Port Adelaide's failure to blow the required signal after the pilot did make out The Julesburg. We do not know just when that was; it may have been as much as a minute before the pilot sounded four blasts, and that delay might have made the difference between collision and safety.

"[5] Nor is it an answer to say that a vessel is justified in assuming that an approaching vessel will do her duty. That is true when the second vessel's future course is plain and when if she continues upon it, the two will pass in safety; the first vessel is not charged with notice that the second will unexpectedly deviate. But the first vessel should not so assume, when, as here, she is not certain of the course of the second. Apparently in the case at bar The Port Adelaide did assume that each of the three courses open to The Julesberg was safe; but that was true only in case The Julesburg acted in season, and there is no doctrine that one vessel is free to assume that the other will take emergency precautions in season, when these will be necessary if she continues as she appears to intend."

The failure to sound a danger signal was held to be a fault in Morrow S. S. Co. v. The Daniel J. Morrell, 90 F.Supp. 300, Affirmed 182 F.2d 347 (C.A.6, 1950). There the vessels Paisley and the Morrell sighted each other when they were 6000 feet apart. A port to port passing was agreed upon. Before passing the Paisley had to make a sharp turn in a narrow channel. When the two vessels were 1600 feet apart, the Morrell was 75 to 80 feet on the Paisley's side of the channel. Notwithstanding the risk of

collision present in this situation, the Paisley continued, even though a collision was probable. The Paisley could not negotiate the sharp turn and avoid the Morrell as it entered the narrow channel at the same time. The Court found that

"No danger signal was sounded by The Paisley at any time, although her master should have realized that a setting for a collision was confronting him. His ship was heading directly into the path of The Morrell which was continuing on its course with speed unabated. * * *

"The Morrell's master, Captain Colson, testified that while still keeping his course and speed of 9 to 10 miles an hour, and while he was yet 600 feet below the Junction Buoy, he determined that there was danger of collision since he figured it was going to be a tight place to get around * * *. Captain Colson said it was apparent to him that The Paisley had difficulty in making the turn, even without having a danger alarm from her, and that he knew his own ship was slow to respond to either a right or left rudder * * *."

In finding a duty on the part of both vessels to sound their danger signals despite the fact that both were aware or should have been aware of the dangerous conditions, the Court said:

"It was the duty of Paisley's master, when he saw The Morrell on his side of the channel and not complying with the passing agreement, when the two vessels were well within one-half mile of each other, to sound a danger signal of several short and rapid blasts of the whistle, not less than four, and to slow down to a speed barely sufficient for steerageway, and, if necessary, to stop and reverse, until proper signals were exchanged and understood, or until the vessels should have passed each other, but not to proceed until safe passing was assured. Rule 26, Great Lakes Pilot Rules, 33 U.S.C.A. § 291; Sec. 322.2, Coast Guard Navigation Rules. The Paisley was guilty of a navigational fault in failing to take these necessary precautions for the safety of both vessels under these rules.

"The Morrell's contributory fault rests in her neglect to take timely precautions to avoid the collision, in her failure to sound a danger alarm until the two vessels were in the jaws of collision, in knowingly maintaining her course and speed in a situation pregnant with danger to both vessels, until too late to avoid that danger, and in her failure to slacken her speed and to reverse sooner, as good seamanship would indicate in the perilous situation, to the creating of which both vessels contributed."

In Eastern S. C. Co. v. International Harvester Co. of New Jersey, 189 F.2d 472 (C.A.6, 1951), the Court found that even though the fault of the vessel Wood was far more serious than the fault on the part of the International, nevertheless, the International must also be found at fault for its failure to slow down when the dangerous situation first presented itself. See also Federal Insurance Co. v. S. S. Royalton, 312 F.2d 671 (C.A.6, 1963).

American Petroleum Co. v. Texas Co., 22 F.2d 290 (C.A.2, 1927); Reiss Steamship Co. v. The Claremont, 12 F.Supp. 288, aff. 80 F.2d 1017 (C.A.2, 1935), and Moran Towing & Transportation Co. v. Conners-Standard Marine Corp., 285 F. 2d 368 (C.A.2, 1960), hold that where the danger was or should have been equally obvious to both vessels, the failure to sound an alarm is not a fault. The Court in these three cases did not discuss the applicability of Rule 26. In the *Moran Towing* case, supra, even though the Gramercy flotilla was traveling on the wrong side of the channel, both vessels could have passed each other safely had not the Gramercy made a rudder turn into the path of the oncoming Moran flotilla. Because of this unexpected deviation, a danger signal from the Moran would not have helped.

■ What Chief Judge Learned Hand said in his dissenting opinion in National Bulk Carriers, Inc. v. United States, 183

F.2d 405, 410 (C.A.2, 1950) is apposite here:

> "If a vessel does not signal, it is, or it should be, because she thinks she will pass safely; and I find it hard to understand the reasoning which excuses her when she thinks she will not pass safely, because the other vessel stands in exceptional need of being informed that she does not."

Chief Judge Learned Hand, speaking for the Court in Port Line v. United States, supra, said:

> "[T]here is no doctrine that one vessel is free to assume that the other will take emergency precautions in season, when these will be necessary if she continues as she appears to intend."

It is understandable that courts desire to mitigate the "Pennsylvania" burden, and the rigors of the divided damages rule. However, this Court has strictly applied the rules of navigation, and has placed a heavy burden upon a vessel to show not merely that her faults might not have been causes, but that such faults could not have contributed to the collision.

We believe the West violated Rule 26 when she failed to sound a danger signal, and that she failed in her burden of showing that this failure could not have contributed to her grounding.

The defensive maneuvers of a vessel are severely limited, and this was especially true in this case. The Captain of the West testified he was aware of the dangerous conditions existing in the narrow channel. He saw the Elpis on his side of the channel coming directly toward him. He knew that once he passed the Elpis, he would have little maneuvering room within which to avoid the grounded Hoffman. When the two vessels were within one-half mile of each other, the West placed a radio-telephone call to the Elpis informing the Elpis she was crowding the West out of the channel. If a radio-telephone call was thought necessary to avoid being crowded out of the channel, certainly a danger signal was appropriate, if not compelled. A change in the course of the Elpis would have enabled the West to pass safely, and the danger signal could well have been the effective measure necessary to alert the Elpis to the fact that her present course was placing the West in danger.

While a rigid application of the Rules is not required by Rule 27,[1] nevertheless, this Rule requires the showing of special circumstances where a departure from the Rules is necessary to avoid immediate danger. We cannot find that under the facts of this case, a departure from the requirement of sounding a danger signal was necessary in order to avoid the grounding.[2]

The judgment is reversed, and the case is remanded to the District Court to enter a judgment consistent with this Opinion.

1. 33 U.S.C. Section 292 (Rule 27). Departure from Rules to avert immediate danger. In obeying and construing these rules due regard shall be had to all dangers of navigation and collision and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger.

2. See also, The Reiss Steamship Company v. United States Steel Corporation, Pittsburgh Steamship Division, 6 Cir., 374 F.2d 142, decided the same day as the instant case.