374 F.2d 142
 The REISS STEAMSHIP COMPANY, Libelant and Cross-Respondent-Appellee,
v.
UNITED STATES STEEL CORPORATION, PITTSBURGH STEAMSHIP DIVISION, Respondent and Cross-Libelant-Appellant.
 No. 16716.
 United States Court of Appeals Sixth Circuit.
 March 16, 1967.
 
 Robert G. McCreary, Jr., Cleveland, Ohio (Arter, Hadden, Wykoff & Van Duzer, David G. Davies, Cleveland, Ohio, on the brief), for appellant.
 Thomas O. Murphy, Cleveland, Ohio (Thomas O. Murphy, John T. Jaeger, Johnson, Branand & Jaeger, Cleveland, Ohio, on the brief), for appellee.
 Before EDWARDS, CELEBREZZE and PECK, Circuit Judges.
 CELEBREZZE, Circuit Judge.
 
 
 1
 This is an appeal in admiralty. The Steamer J. L. Reiss, owned by the Libelant, and the Steamer Sewell Avery, owned by the Respondent, collided in the upper Saint Clair River at 5:45 a. m., September 24, 1962. After a lengthy trial in the District Court, the Sewell Avery was found to be solely at fault, and judgment was entered for the Libelant. The Respondent appeals.
 
 
 2
 Dense fog, the seaman's old adversary, once again created a dangerous condition with which two vessels were unable to cope. The fog, which obscured the movements of the two vessels, also obscured the manner in which they collided. Many of the facts, then, are not only in sharp dispute, but even irreconcilable.
 
 
 3
 The Steamer J. L. Reiss (Reiss) is 489 feet in length, 52 feet in beam, and is powered by a 1650 horsepower steam engine. The Steamer Sewell Avery (Avery) is 605 feet in length, 60 feet in beam, and is powered by a 2500 horsepower steam engine. Both vessels are equipped with radars.
 
 
 4
 On September 24, 1962, the Reiss was proceeding up the Saint Clair River, heading north to Two Rivers, Wisconsin laden with a cargo of coal. The Saint Clair River runs generally north and south, bounded on the west by the United States and on the east by Canada. The River in the vicinity of the collision is approximately 2,200 feet wide from shore to shore, and the navigable part of the River is about 1700 feet wide. At the same time, the Avery was proceeding down the Saint Clair River, heading south to Lorain, Ohio, laden with stone. The Reiss was proceeding on the east, or Canadian side of the River, and the Avery was proceeding on the west, or American side of the River.
 
 
 5
 Because of fog, the Reiss checked to half speed at approximately 4:50 a. m., near Russell Island. The current speed in that general area of the Saint Clair River was from two to three miles per hour. The speed of the Reiss over the ground was from four to five miles per hour. At 5:00 a. m., the Reiss monitored a radiotelephone call from the Avery stating that the Avery was going to anchor at Robert's Landing. Libelant's Exhibit No. 3 is reproduced to show the various movements of the two vessels.
 
 
 6
 NOTE: OPINION CONTAINING TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 7
 When the Reiss was two miles below Robert's Landing Buoy (37),[1] the Reiss observed the Avery on its radar, about a mile and two-tenths above the Reiss on the Canadian side of the River.[2] At this time the Reiss was heading north on the Canadian side. Realizing the Avery was lying in the channel directly ahead of the projected path of the Reiss, the Reiss changed its course, crossing the River and proceeding upbound on the American side.[3]
 
 
 8
 When the Reiss reached Willow Point Light, the Captain of the Reiss noticed a pip on his radar which was the Avery moving away from the shore. When the Reiss was approximately 1,000 feet from the Avery,[4] the Captain of the Reiss noticed the angle between the Avery and the Canadian shore become wider as the Avery moved quickly away from the shore. The radar showed the Avery moving across stream toward the American shore and downstream. The Captain of the Reiss explained this situation when he testified:
 
 
 9
 "* * * all of a sudden, when you have a clear-sky section, an angle broke away from the Canadian side of the bank, and the target appeared so large and leaving a smear or trail behind, it was quite a surprise. Then I realized I was in trouble at this sudden change of the target from my right."
 
 
 10
 At this point the First Mate of the Reiss was ordered to call the Avery and inform her that they "were drifting or moving fast", and that they were "drifting down upon" the Reiss. The Avery did not respond to this call. The First Mate was then ordered to go to the fore-castle deck and stand by the anchor. The Captain of the Reiss testified he did not know what the Avery's intentions were.
 
 
 11
 The Reiss visually sighted the Avery for the first time when the two vessels were approximately three hundred feet apart. The Reiss was moving at bare steerageway, two to three miles per hour. The Captain of the Reiss ordered the rudder hard left, and the engines full speed ahead for five seconds, and then reversed the engines. The purpose of this maneuver was to avoid a direct blow. The stem of the Avery struck several blows to the starboard side of the Reiss. The closing speed of the two vessels was variously estimated to be from two to eight miles per hour. Substantial damage was done to the Reiss.
 
 
 12
 The collision occurred at 5:45 a. m. The crew of the Reiss placed the point of collision approximately three-quarters of a mile south of Robert's Landing Buoy No. 37, and close to the American side.[5] Independent testimony supported this location. The Avery's crew placed the collision in various locations, one such location was approximately seven-tenths of a mile south of Robert's Landing Buoy No. 37.[6]
 
 
 13
 After the collision the Reiss was approximately 250 to 300 feet off the American shore. The Captain of the Reiss testified that by using a combination of reversing his engines and dropping an anchor, he could stop within 50 to 60 feet.
 
 
 14
 According to the crew of the Avery, the Avery went to anchor at 5:00 a. m., because of the fog. From that time until the time of collision, the Avery continued to sound the signal of a ship at anchor. The Avery gave a radio call that it was going to anchor in the vicinity of Robert's Landing, near the American shore.
 
 
 15
 When the Avery's stern anchor was dropped, the bow of the Avery was headed 190 degrees, or almost due south. Seventy fathoms, or 420 feet of anchor were let out. The Avery then dropped her starboard anchor. Subsequently, the stern of the Avery swung to the left, toward the Canadian shore. The bow swung from 190 degrees to 220 degrees. To correct this movement, the Captain of the Avery ordered some of the chain of the stern anchor taken in. Due to the fact that a pin had sheared on the stern anchor windlass, the stern anchor could not be retrieved. To bring the vessel back to a heading of 190 degrees and thus straighten out the swing of the Avery's stern, the Captain ordered slow speed ahead at 5:25 a. m., half speed ahead at 5:27 a. m., and full speed ahead at 5:32 a. m. The Avery ran full speed ahead from 5:32 a. m. to 5:41 a. m. At 5:42 a. m. the Avery's engines were stopped. The crew of the Avery testified that at the time of the collision at 5:45 a. m., the Avery was making no headway. While there is some dispute, it appears the stern anchor was down during the entire maneuver. The Avery maintains that it was on the American side of the channel when it went to anchor, and that it remained on the American side until the collision.
 
 
 16
 The Captain of the Avery testified he did not know the Reiss was in the River until the Reiss appeared out of the fog. However, one of the crew members of the Avery testified he reported the fog signals of two vessels downstream to the Captain. The Avery gave a danger signal seconds before the collision, no danger signal was heard from the Reiss.
 
 
 17
 From a distance of one and two-tenths miles below the Avery until the point of collision, the Captain of the Reiss constantly observed the anchored position of the Avery. When the Avery suddenly broke away from the Canadian side of the River, the Captain of the Reiss stated he was not only surprised, but also realized he was in danger. The position of the Avery at this time was laterally across the River, approximately 1,000 feet from the Reiss. From the point where the Reiss observed the sudden movement of the Avery (point P-4) to the point of collision (point P-3), the Reiss traveled approximately 1,300 feet. The Captain of the Reiss testified he did not consider stopping because the Avery would cut the Reiss in two, and consequently he wanted to get out of the way. However, the speed of the Reiss which was then between two and three miles per hour did not change until moments before the collision. If the Reiss traveled 1,300 feet (from point 4 to point 3 on the map), as her Captain said she did, then it would have taken the Reiss approximately five minutes to cover this distance. Further, the Captain of the Reiss testified that after he passed Willow Point Light, he noticed a change in the position of the Avery, and as he continued up the River, he saw the Avery continue to move away from the Canadian side of the River. At 1,000 feet the angle between the Avery and the Canadian bank greatly increased. During all of this time, the Avery was giving the signals of a ship at anchor.
 
 
 18
 When the two vessels visually sighted each other for the first time, the Avery was heading westerly, directly toward the American shore. Just prior to the collision, the Avery began swinging to her left. Seconds prior to the collision, the Reiss moved left full speed ahead, then five seconds before the collision reversed her engines.
 
 
 19
 This is a close and difficult case because as seen through a fog, the facts are splintered and cast into a vague abstract form.
 
 
 20
 From unclear and often irreconcilable facts, the Avery was found to be solely at fault. The Appellant does not urge us to reject the factual findings of the District Court, realizing "that in an admiralty case in which the testimony is contradictory and the exact facts difficult to ascertain, the findings of the District Judge who saw and heard the witnesses will not be set aside unless clearly erroneous." Federal Insurance Co. v. S. S. Royalton, 312 F.2d 671 (C.A.6, 1963).
 
 
 21
 Appellant does urge that the Reiss violated statutory Rule 26, 33 U.S.C. Section 291. Great Lakes Navigation Rule 26 requires as follows:
 
 
 22
 "If the pilot of a steam vessel to which a passing signal is sounded deems it unsafe to accept and assent to said signal, he shall not sound a cross signal; but in that case, and in every case where the pilot of one steamer fails to understand the course or intention of an approaching steamer, whether from signals being given or answered erroneously, or from other causes, the pilot of such steamer so receiving the first passing signal, or the pilot so in doubt, shall sound several short and rapid blasts of the whistle; and if the vessels shall have approached within half a mile of each other both shall reduce their speed to bare steerageway, and, if necessary, stop and reverse."
 
 
 23
 Appellees, of course, claim that in considering application of Rule 26 to the Reiss, we should take into account "the special circumstances" with which her Captain was confronted. In this regard they rely upon Rule 27, 33 U.S.C. Section 292, which says:
 
 
 24
 "In obeying and construing these rules due regard shall be had to all dangers of navigation and collision and and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."
 
 
 25
 We recognize, of course, that in narrow channel waters such as these, proceeding against a three-mile per hour current in dense fog, the Captain of the Reiss could not, without hazard of grounding his ship, stop his engines, reverse and drop anchor as freely as could a ship in open water.
 
 
 26
 Thus the Captain of the Reiss may well claim that "special circumstances" excused his failure to stop engines, or reverse them, and drop anchor. Without deciding this issue, however, we are unable to see any hazard that could have resulted to his ship from his blowing the danger signal which is also required by Rule 26. This he should have done as soon as he saw on his radar screen that the ship which he was seeking to pass was swinging away from the Canadian shore on a potential collision course with his vessel. Such a signal was called for even more definitely by the fact that the Avery was blowing an "at anchor" signal entirely contradictory to her actual movement as seen by the Reiss' Captain on the radar screen, and as subsequently testified to at this trial. In the facts of this case, it seems entirely possible that prompt sounding of the danger signal might have alerted the Avery to the danger and caused a change in the Avery's dangerous cross channel maneuver.
 
 
 27
 Navigation rules have been strictly and literally construed, and Admiralty Rule 26 has been construed to place a heavy burden on the vessel failing to follow its provisions to show not merely that the fault might not have been the cause, but that such fault could not have contributed to cause the collision. Belden v. Chase, 150 U.S. 674, 698, 14 S.Ct. 264, 37 L.Ed. 1218 (1893); The Pennsylvania, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874); The Law of Admiralty, Gilmore and Black, pp. 404 and 405. We cannot say that as the dangerous events began to unfold, the Reiss met the heavy burden placed upon it by Rule 26, by showing that the failure to sound a danger alarm could not have contributed to the collision.
 
 
 28
 The judgment is reversed, and the case is remanded to the District Court to enter a judgment consistent with this Opinion.
 
 
 
 Notes:
 
 
 [1]
 Point P-1 on the map
 
 
 [2]
 Point P-2 on the map
 
 
 [3]
 However, the First Mate of the Henry R. Platt, Jr., which was proceeding upstream, four-tenths of a mile behind the Reiss on the Canadian side of the River testified that as the Reiss was proceeding upstream toward Willow Point on the American side of the channel, the Avery was lying in the channel directly ahead of the projected path of the Reiss
 
 
 [4]
 Point P-4 on the map
 
 
 [5]
 Point 3 on the map
 
 
 [6]
 Point 7 on the map