### STEAMTUG NO. 15.

(District Court, E. D. New York. November 23, 1907.)

COLLISION—STEAM VESSELS PROCEEDING IN SAME DIRECTION—COMMON FAULT.

A steamer and a transfer tug with two car floats both *held* in fault for a collision between them in the daytime in Long Island Sound, while both were moving westward on converging courses, because each apparently insisted on the right of way, and proceeded without reference to the other, until too late to prevent the collision.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 52.]

In Admiralty. Suit for collision.

Alexander & Ash, for libelant.
William Greenough, for claimant.

CHATFIELD, District Judge. Shortly after 1 p. m., on May 14, 1906, the steamboat Mary Gordon, owned by one Florance A. Davis, was proceeding westward in Long Island Sound upon a trip to New York City. This vessel is a freight steam propeller, about 89 feet 6 inches long. At the same time a large and powerful tug of the New York, New Haven & Hartford Railroad, No. 15, was proceeding westward in Long Island Sound, to New York, having in tow two large car floats, upon each of which there were at the time freight cars. The tug was between the floats; the forward ends of the floats coming close together so as to facilitate their progress through the water. As the Gordon came through the central passage between North and South Brother Island, she sighted the Transfer and the floats near the shore opposite Port Morris. The Gordon proceeded down the center channel, while the Transfer proceeded down along the shore. At this time the tide was flood, and therefore impeded the progress of each boat, and, if it affected direction at all, caused the Transfer and its floats to have a tendency to work out from the shore. According to the chart introduced in evidence, and weighing the testimony of all the witnesses, the Transfer would seem to have covered during the time under discussion a slightly greater distance than the Gordon. The boats came in collision near what is called the "Middle Ground," opposite the Sunken Meadows; and the manner of collision was that the float upon the port side of the tug struck and continued to penetrate the starboard quarter of the Gordon in such fashion that the Gordon swung around across the bows of the float until she rested upon the starboard side of the starboard float. Later Transfer No. 15 towed the two floats and the Gordon to New York; the speed of the Transfer being sufficient to keep the towline taut, although the Gordon was working her engines. The entire situation would indicate that the speed of the Transfer with the tow was slightly greater than that of the Gordon. The exact point of collision is one of the principal matters of dispute. The witnesses on behalf of the Gordon locate the collision in the center of the Sound opposite the Sunken Meadows, and about over the shallower portion called "Middle Ground," having a depth upon the chart of from 13 to 18 feet. The draft of the Gordon would allow her to pass over this spot without injury, although it might affect her speed. The witnesses on behalf of the Transfer locate the collision much closer to the shallow water along the Sunken Meadows, and testify that the Gordon was heading for the deeper channel to the north of Middle Ground, and between the Middle Ground and the shore.

The rule is invoked on behalf of the Gordon that:

"When steam vessels are running in the same direction, and the vessel which is astern shall desire to pass on the right or starboard hand of the vessel ahead, she shall give, * * * and under no circumstances shall the vessel astern attempt to pass the vessel ahead until such time as they have reached a point where it can be safely done," etc. Rule 8 (Act June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2882]).

The rule is invoked on behalf of the Transfer that:

"When two steamers are approaching the narrows known as 'Hell Gate,' on the East river at New York, side by side, or nearly so, * * * from the east, and are abreast of Negro Point, the steamer on the right or starboard hand of the other shall have the right of way," etc. Rule 7.

But the situation does not seem to be such that an absolute dependence upon either of these rules could be relied upon by either of the vessels. It appears from the testimony that there was room enough for the vessels to pass; that nothing compelled them to come into close enough quarters to endanger either; that each boat, thinking it had the right of way, kept on its course until in a dangerous situation, and then neither vessel apparently could avoid the collision. There is nothing to show that there was a lack of realization upon the part of the officers of either vessel. Each knew where the other was. The vessels were at all times in plain sight, and they were pursuing courses that would approximately bring them alongside, and, before the situation of danger was reached, both parties should have taken measures to avoid trouble. The testimony on behalf of the Gordon is too clear to make it possible to accept the situation given by the witnesses for the Transfer as the place of collision. The testimony of the witnesses on the Transfer, and her draft, as well as the testimony of the witnesses from the other vessel and the shore, make it impossible to accept entirely the testimony on behalf of the Gordon, that the collison occurred in a spot where the Transfer might have gone ashore at low tide.

The necessary conclusion is that the accident happened somewhere between the points located by the parties, and happened because the vessels held their courses too long before giving way. With the whole Sound at the use of the Gordon, it is difficult to see why she could not have kept away from the Transfer. With the Gordon in plain sight, on a course that would bring the two vessels close together, and with the lookout on the Transfer looking at the Gordon, but giving no warning, it is impossible to see how the Transfer can be excused for keeping on her course until the Gordon could not get out of the way; and it must be held that both vessels were at fault in the matter. It is not considered to be the law that vessels can persist in insisting upon their own right of way until a collision happens, when the circumstances and situation show plainly that the resulting positions of the vessels will make the actual rule to be applied a matter of doubt. Where, under these conditions, vessels have entire freedom of motion, and an accident results, which without any danger or inconvenience could have been avoided, each vessel failing to take precautions should be held to its share of responsibility in the matter.

A decree may be entered giving to the libelant one-half of the damages to be ascertained. The costs of each will be divided.