**OIL TRANSFER CORP.**

v.

**THE CREE et al.**
**THE OIL TRANSFER NO. 31.**

**THE PENN NO. 5.**

**THE DAUNTLESS NO. 12.**

**THE K. WHITTELSEY.**

United States District Court
S. D. New York.
May 19, 1954.

Macklin, Speer, Hanan & McKernan, New York City, for libellant and respondent-impleaded. John C. Hart and Gerald J. McKernan, New York City, of counsel.

Foley & Martin, New York City, for tug Cree. James A. Martin and Warren J. Martin, New York City, of counsel.

Platow & Lyon, New York City, for respondent Penn No. 5. John A. Lyon, New York City, of counsel.

Herbert P. Reid, for respondent Dauntless No. 12.

McGOHEY, District Judge.

On November 28, 1950, the barge OT–31 owned by libellant Oil Transfer Corporation, a Delaware corporation, was damaged when it struck the east and west walls at the north end of the government lock in the Hudson River near Troy, N. Y. A freshet condition existed, with a two to four foot rise in the river, and a three to four mile increase in the speed of the current, the result of a severe storm a few days before.

The libel charges that the negligent navigation of the respondent vessels, all tugs, caused the OT–31 to strike the walls. The tug K. Whittelsey, of which libellant is claimant, was impleaded.

About 1:45 P.M. the laden OT–31, made up with the tug K. Whittelsey, pusher-fashion, departed Waterford Terminal for the southbound trip to Carteret, N. J. In the Hudson River some two and one-half miles south of Waterford is the Troy Lock. Because of the existing freshet condition, the government engineers in charge of the lock required all vessels locking through to have the assistance of two tugs, in order to prevent damage to the lock. To comply with this requirement the tug Otco was engaged to join the tow in the vicinity of the lock. Weather conditions were poor, with sleet, snow and reduced visibility.

On the trip downstream an uneventful meeting was had with a northbound tow, consisting of the tugs Penn No. 5, Dauntless No. 12, and the Oil barge Morania 140, somewhere to the north of 112th Street bridge, and south of buoy No. 7. After passing the 112th Street bridge and in the vicinity of buoy No. 5, The K. Whittelsey and tow were passed by the tug Otco, which proceeded down to the lock. The K. Whittelsey blew the regulation lock signal signifying an intention to lock, when in the vicinity of buoy No. 5, about a mile from the lock.[1] The tug Otco, having gone to within 300 feet of the lock, also blew the

---

1. "Rules and Regulations to Govern the Use, Administration, and Navigation of the United States Lock in the Hudson River at Troy, N. Y. No. 2: Signals.— Steamboats or tows desiring lockage in either direction shall give notice to the locktenders, at not more than three-quarters of a mile from the lock, by one long blast of the whistle, not exceeding 10 seconds; followed by one short blast, not exceeding 3 seconds. The signal from the lock for boats or other craft to enter will be shown by the signal posts."

signal and rejoined The K. Whittelsey and OT–31 in the vicinity of buoy No. 2. The Otco tied up with its starboard bow to The OT–31's starboard bow, The Otco heading upstream so as to hold the tow against the current.

The three-unit tow had drifted about halfway to buoy No. 1, and close in to the east bank, when, without any passing signals, The Penn No. 5 and The Dauntless No. 12 passed to starboard of the unit, on their return from the Waterford Terminal. These tugs tied up to the east lock wall close to the lock gate to await lockage.

By this time the snow had stopped, visibility had cleared, and the lock which heretofore had been obscured had become visible to those aboard The K. Whittelsey, standing by in the area north of buoy No. 1, about 1500–1600 feet north of the lock gate.

The lock used two signal devices, a green-red light signal and a semaphore arm. At the time the lock first became visible to The K. Whittelsey and tow the semaphore was down and the red light showing, signifying that the lock was in use.

Within a short time the superstructure, and then the entire outlines, of two tugs and a barge, being raised in the lock and heading north, became visible to the waiting K. Whittelsey unit. At about the same time the tugs Penn No. 5 and Dauntless No. 12 which had been tied up to the east lock wall proceeded to a point near the north end of the west lock wall to allow room for the northbound unit to pass out of the lock.

The gates of the lock opened and the unit, consisting of the tug Cree towing and the tug Chemung pushing the barge Hygrade 12, came out. As the stern of The Chemung cleared the lock wall, The K. Whittelsey still in a position north of buoy No. 1, in preparation for beginning its run on the lock, and believing itself to have precedence, exchanged starboard meeting signals with the northbound unit, signaled The Otco to cast off, and,

this accomplished, began its run on the lock.

About this time the navigator of The K. Whittelsey noticed The Penn No. 5 and Dauntless No. 12 enter the lock. Although he considered himself entitled to enter the lock first by virtue of his prior locking signal, his position in the stand-by area and the fact that he was encumbered with a tow, he did not consider the situation alarming since he would have room to get a line out and stop his tow part way in the lock; the tugs could then be rearranged and all the vessels locked down together.

As The K. Whittelsey and its tow proceeded to the meeting with the northbound unit, the tug Cree cast off from The Hygrade 12, held to the west side of the river to allow the barge and The Chemung to pass, and then rounded to to starboard passing under the stern of The Chemung and directly into the path of The OT–31 and K. Whittelsey. Having completed its turn The Cree proceeded into the lock, the gates of which were thereupon closed. The OT–31 and K. Whittelsey which by that time had headway and a three to four mile current under foot took action to stop, so as to prevent collision with the lock gates. As a result The OT–31 struck the east wall, caromed off and struck the west wall a glancing blow and was brought to a stop only 30 feet from the lock gates after getting a line to the west wall. It is for the damage resulting from these collisions with the lock walls that libellant sues claiming negligence and statutory violation against the tugs Penn No. 5, Dauntless No. 12 and Cree.

The testimony as introduced by the parties seems in agreement on the sequence of events as outlined above. On the questions of distance and speed there are minor discrepancies which however do not change the issues here involved. One main area of dispute is whether the lock signal was red or green when The Cree returned to the lock. Taft, The Cree's navigator, maintained that he never saw the lock signal on green; that

he had been cleared to reenter the lock on a red signal, and did so. On the other hand, witnesses for The Penn No. 5 and Dauntless No. 12 as well as for libellant testified that the light went green when the stern of The Chemung cleared the lock walls, and remained green at least until after The K. Whittelsey and her tow had begun their run to the lock, and until after The Penn No. 5 and The Dauntless No. 12 had gone into the lock. The latter version is by far the more persuasive and is accepted.

█ In so far as The Penn No. 5 and Dauntless No. 12 are concerned there seems to be no close causal connection between anything done by them and the damage done to The OT–31. The Penn No. 5 and The Dauntless No. 12 probably did not sound the statutory one blast for a starboard passage, presumably because The K. Whittelsey tow was lying in toward the east bank. While The Penn No. 5 and Dauntless No. 12 may have been at fault in not allowing the encumbered tow to enter the lock first, there was no causal relation between that and the damage to OT–31 because, as her Captain admitted, The K. Whittelsey tow could easily have locked through with the two tugs.

The Cree defends and explains its action on the ground that the lock tender who under the regulations has final authority to give precedence in entering the lock,[2] had given The Cree permission to lock back through with The Penn No. 5 and Dauntless No. 12; that although The Cree saw The K. Whittelsey tow upriver, she did not know whether it was under way; that The K. Whittelsey tow was deliberately trying to "run the canal"; and that no accusation was made against the three tugs at the time of the accident but only against the lock tender.

█ It appears that the lock tender did clear The Cree back into the lock, but neither this clearance nor any rule of the road frees The Cree from the duty to use ordinary care and proper seamanship.[3] It may not insist upon what it believes to be its right of way into a collision,[4] nor may it escape liability for an unreasonable adherence to a course of conduct simply because it was not itself in collision.[5] The Cree's Captain, being familiar with the lock, must have known that the lock tender had no way of communicating with The Whittelsey. While it seems probable that Dennis, navigator of The K. Whittelsey, is inaccurate in regard to some of his estimates of distances, still there seems to be no doubt that The Cree did round to into the path of The K. Whittelsey tow at a time when she should have known that The K. Whittelsey unit was making its run to the lock. By his own testimony, Taft of

2. "Rules and Regulations to Govern the Use, Administration, and Navigation of the United States Lock in the Hudson River at Troy, N. Y. Reg. 1: Authority of Lockmaster.—The movement and position of all boats and floating craft, while at the lock or in the entrance thereto, shall be subject to the direction of the locktenders, whose orders must be obeyed by masters and others in the operation and mooring of such boats and craft. The men in charge of boats shall give such assistance in making the lockages as the locktenders may require.

"Reg. 4: Precedence.—Usually, the boat arriving first at the lock will be the first locked through; but when many boats are to be passed, precedence will be given to the boats belonging to the United States. Passenger boats will have precedence over tows and like craft. If the traffic is crowded in both directions, up and down lockage will usually be made alternately but the locktender may permit two or more lockages to be made at one time in the same direction when this will not cause unreasonable delay. In case two or more boats or tows are to enter for the same lockage, they shall enter as directed by the locktender. No boat shall run ahead of another while in the lock. The boat that enters first shall leave first."

3. Art. 29 of the Inland Rules, 33 U.S.C.A. § 221.

4. La Lorraine, 2 Cir., 1926, 12 F.2d 436; Steam Tug No. 15, D.C.E.D.N.Y.1907, 157 F. 142.

5. Bank Line Limited v. The Rio Atuel (The Hollybank), D.C., 101 F.Supp. 523, affirmed on decision below, 2 Cir., 1951, 193 F.2d 178.

The Cree did not think The K. Whittelsey unit was at anchor; he knew that The K. Whittelsey unit was in the waiting position for locking through; The K. Whittelsey was encumbered with a tow and was therefore privileged. Once The K. Whittelsey had exchanged the meeting signals The Cree should have known that the former was under way toward the lock. While ordinarily it might be contended that even though The K. Whittelsey was under way. knowledge that she intended to lock through rather than tie up on the wall should not be charged to The Cree, this argument is untenable in the face of the freshet condition. Once The Otco had cast off and The K. Whittelsey had begun its run, it had either to continue into the lock, go over the dam, or collide with the lock gates or walls. That it could not enter the lock with The Cree in it even had the gates remained open is clear from the findings as to dimensions. Accordingly The Cree was under a duty to give way to the encumbered tug and its unwieldy tow.[6] The Cree was therefore guilty of negligent navigation which caused the damage to The OT–31.

The question then arises whether or not The K. Whittelsey was contributorily at fault for not more promptly taking action to avert collision by sounding the danger signal[7] and reversing engines, as soon as it was ascertained that The Cree had cast off. In the first place, she was justified in assuming that The Cree would yield to an encumbered tow. Moreover it is not at all clear that sooner reversing would have had any effect under the conditions existing that day. Once her helper tug, The Otco, had cast off the best The K. Whittelsey could do was to guide the cumbersome OT–31 into the lock out of the current, and there stop her. But even if more prompt action could have had some appreciable effect it cannot be said that Dennis, who was confronted with an emergency, was guilty of fault simply because he did not follow what in retrospect may appear to be a sounder course. Dennis testified that he never expected The Cree to "steal the lock" and that he had sufficient room in the lock and control over the barge to make it feasible for him to continue provided The Cree had not entered the lock and the gates had not been closed. As soon as Dennis became aware that The Cree was entering the lock and that the gates would be closed he took what measures seemed best to him under the circumstances, and I cannot say he was wrong in view of the comparatively slight damage resulting here where major damages to the lock itself might otherwise have occurred.

The K. Whittelsey cannot be held at fault for not sounding the danger signal. This was not the ordinary crossing or overtaking situation, but rather a case of special circumstances with The K. Whittelsey attempting to maneuver its tow into the lock.[8] Dennis, seeing The Cree round to but not expecting him to steal the lock, was entitled to assume The Cree was returning to the lock wall to await a subsequent lockage. Thus the danger was not apparent until The Cree headed into the lock, and at that time sounding the danger signal would have been a vain effort[9] to avoid a situation created by The Cree's own wrongful action and of which it should have been fully aware.[10]

The tug Cree was wholly at fault for the damages sustained by the barge OT–31.

The Court's findings and conclusions are being filed herewith.

Submit proposed interlocutory decree providing for reference of the question of damages to a Master unless stipulated.

---

**6.** The Titan, 2 Cir., 1897, 79 F. 117, certiorari denied 166 U.S. 722, 17 S.Ct. 1001, 41 ·L.Ed. 1188.

**7.** 33 U.S.C.A. § 203, Art. 18, Rule III.

**8.** 33 U.S.C.A. § 212, Art. 27; The James

A. McKenna, 2 Cir., 1928, 25 F.2d 639; The John Rugge, 2 Cir., 1916, 234 F. 861.

**9.** Bank Line Limited v. The Rio Atuel (The Hollybank), Footnote 5 supra.

**10.** Id.